FILED
2005 Aug-10  PM 12:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# EASTERN DIVISION

| | | |
|---|---|---|
| **STATE OF ALABAMA**, <br> **Plaintiff,** | ] <br> ] <br> ] | |
| **and** | ] <br> ] | |
| **STATE OF FLORIDA,** <br> **Intervenor-Plaintiff** | ] <br> ] <br> ] | **Case No. CV-90-BE-1331-E** |
| **vs.** | ] <br> ] | |
| **UNITED STATES ARMY CORPS** <br> **OF ENGINEERS**, *et al.*, <br> **Defendants.** | ] <br> ] <br> ] | |

## MEMORANDUM OPINION

Before the court are Florida's [second] Motion to Amend (Doc. 269) and Alabama's [second] Motion to Amend (Doc. 270). For the reasons set forth below, and for the reasons stated at the June 30, 2005 hearing on the motions, the court grants the motions.

Further, the court orders Alabama and Florida to revise their amended complaints to clarify *exactly* which agency actions they are challenging under *each* claim, and to make other changes *only* as necessary to clearly articulate the basis of this court's jurisdiction.

## I. Facts and Procedural History

On June 28, 1990, Alabama filed a complaint against the United States Army Corps of Engineers and several of the Corps' officers in their official capacities challenging a number of the Corps' activities, plans, and actions primarily regarding the management of three reservoirs in Georgia: Carters Lake, Lake Allatoona, and Lake Lanier. Carters Lake and Lake Allatoona are part of the Alabama-Coosa-Tallapoosa (ACT) river basin. Lake Lanier is part of the

Apalachicola-Chattahoochee-Flint (ACF) river basin.  Alabama and its citizens are downstream from these reservoirs and rely on water from both the ACT and ACF river basins.

Beginning soon after Alabama filed suit, a number of entities moved to intervene in the case, including Florida,[1] Georgia, and the Atlanta Regional Commission (ARC).  *See* Doc. 21, *Florida's [Original] Motion to Intervene*; Doc. 31, *Georgia's [Original] Motion to Intervene*; Doc. 34, *Water Supply Intervenors' Motion to Intervene*.  Florida sought to intervene as a plaintiff, and Georgia and ARC sought to intervene as defendants.

To foster settlement negotiations, on September 14, 1990 Alabama and the Federal Defendants[2] filed a Joint Motion to Stay Proceedings, agreeing that, "until such time as the stay is terminated [under the terms of the joint motion], Defendants agree not to execute any contracts or agreements which are the subject of the complaint in this action unless expressly agreed to, in writing, by Alabama and Florida."  *See Doc*. 41.  The court[3] granted the Joint Motion to Stay, noting that "the court views the parties to this action as bound by the terms of their joint motion."  *Doc*. 44.  That stay was repeatedly extended by every judge who has presided over this case.

---

[1] Florida and its citizens are downstream from the ACF reservoirs and rely on water from the ACF river basin.

[2] In this opinion and throughout the case, the court and the parties have referred to the United States Army Corps of Engineers and the Defendant Corps officers collectively as the "Federal Defendants" or, simply, "the Corps." At the time of the filing of the 1990 Joint Motion to Stay, Alabama and the Federal Defendants were the only parties to the case.  The Joint Motion to Stay also granted certain rights to, and recognized certain obligations of, Georgia and Florida, who had been involved with the parties in settlement discussions.  *See* Doc. 41, p.2-3.  Georgia apparently did not agree with the Joint Motion to Stay.  *See* Doc. 44, *September 19, 1990 Order*, p. 1.

[3] Now-Senior United States District Judge James H. Hancock was at that time presiding over the case.  A succession of judges have been involved with this case until November 14, 2001, when the case was reassigned to this judge.  *See* Doc. 120, *Notice of Reassignment*.

Following a 1992 stay Order, which preserved rather than superseded the conditions of

the 1990 stay Order,[4] the court denied several pending motions, including Florida's, Georgia's,

and ARC's motions to intervene, without prejudice to refile in the event the stay was lifted.  *See*

*February 5, 1992 Order*, Doc. 54.

In January, 2003, without the Corps first complying with the termination provisions of the

1990 Joint Motion to Stay, the Corps and Georgia entered into a settlement agreement ("the D.C.

agreement") with other parties in related litigation in the United States District Court for the

District of Columbia (the "D.C. Case").  Alabama responded on January 27, 2003 by filing a

motion in this case for a temporary restraining order and preliminary injunction against the

Corps, arguing that the Corps had violated the terms of the 1990 stay Order.  Limited litigation

activity commenced, interspersed with more stay orders, as requested by the parties, to permit

them opportunities to settle the dispute over the D.C. agreement among themselves.

On September 8, 2003, Florida renewed its motion to intervene, which was not

accompanied by a new proposed complaint.[5]  *See* Doc. 158, *Florida's First Amended Motion to*

*Intervene*.  In an Order setting the case for a hearing on Alabama's request for a TRO and

preliminary injunction, the court granted Florida's motion to intervene and permitted Florida to

file its complaint in intervention by September 12, 2003.  Doc. 161, *September 10, 2003 Order*

*Granting Florida's Motion to Intervene*.  On September 12, 2003, Florida filed its first

complaint, which it styled as its "First Amended Complaint" because that complaint was

---

[4]*See* Doc. 192, *October 15, 2003 Preliminary Injunction Order*, pp. 2-4.

[5]Florida requested leave to file its amended complaint by September 12, 2003, stating
that, in light of events in related cases, it needed more time to draft a complaint.  *See* Doc. 158,
*Florida's First Amended Motion to Intervene*.

different from its original 1990 proposed complaint in intervention.  *See* Doc. 165, *Florida's First Amended Complaint*.  No Defendants answered Florida's First Amended Complaint, presumably because, as discussed below, on November 24, 2003, the court again stayed the case.

On September 11, 2003, Georgia renewed its motion to intervene as a defendant, and the court granted the motion.  *See*  Doc. 162, *Georgia's Renewed Motion to Intervene*; Doc. 183, *September 23, 2003 Order Granting Georgia's Motion to Intervene.*

On September 23, 2003, Alabama moved to amend its complaint because, "[d]uring the thirteen years which have passed since Alabama filed its original complaint and the six years which have passed since the execution of the ACF and ACT compacts, new factual developments have taken place which warrant additional and supplemental factual allegations and legal counts against the Corps and its officials."  *See* Doc. 184.  Alabama attached to its motion a copy of its proposed "First Amended Complaint."  *See* Doc. 184 Attachment 1.

On October 15, 2003, after a hearing on September 24, 2003, the court found that the Corps had violated the September 19, 1990 stay Order, and entered a preliminary injunction prohibiting the Corps from "filing the settlement agreement in [the D.C. Case], implementing the settlement agreement,. . . or, [without this court's approval,] entering into any other new storage or withdrawal contracts affecting the [ACF] river basin."  *See* Doc. 192, *October15, 2003 Preliminary Injunction Order*.  The court specified that the injunction would last <u>only</u> until this case is resolved on the merits, and may be lifted earlier "for just cause."  *Id*. p. 11.

On November 6, 2003 ARC attempted to make a "special appearance" to contest this court's jurisdiction to enter the October 15, 2003 preliminary injunction.  *See* Doc. 196.  In December, Georgia, the Corps, and ARC (who was not a yet a party) each filed Notices of

4

Appeal from the October 15, Preliminary Injunction Order. *See* Docs. 204-206.

Meanwhile, no party filed an opposition to Alabama's motion to amend.  On November 24, 2003, "recongiz[ing] that the complexion of this litigation has changed considerably over the last thirteen years[,]... in an effort to ensure this dispute resolves on timely matters," the court granted Alabama's first Motion to Amend.  *See November 24, 2003 Order*, Doc. 203.  In the same Order, the court stayed the case "until Judge Thomas Penfield Jackson makes an order in *Southeastern Federal Power Customers, Inc., v. United States Army Corps of Engineers*, C.A. No. 00-2975 (T.P.J.) (D.D.C.), deciding the validity of the proposed settlement in that case."  *Id.* The court required Alabama to file its amended complaint within 10 days after the lifting of the stay.  *Id.*

On February 10, 2004, Judge Jackson entered an Order declaring that the D.C. agreement was "valid and approved, and may be executed and filed and thereafter performed in accordance with its terms; provided, however, that the preliminary injunction entered by N.D. Ala. on October 15, 2003, is first vacated." *Southern Federal Power Customers, Inc. v. Caldera*, 301 F. Supp. 2d 26, 35 (D.D.C. 2004) (the "D.C. Order").  Accordingly, the due date for Alabama's amended complaint was February 25, 2004.  On February 24, 2004, Alabama and Florida filed a joint, unopposed motion to extend the time to file amended complaints.[6]  *See* Doc. 217.  The court granted the motion (Doc. 218), and extended the deadline to March 10, 2005.  Both Alabama and Florida filed "Second Amended Complaints" on March 10, 2004.  *See* Doc. 221,

---

[6]In their February 24, 2004 motion, Alabama and Florida requested the court to extend the due date for their amended complaints to March 10, 2005, although Florida had not filed a motion to amend its complaint or obtained permission to do so, and although the Order (Doc. 203) containing the deadline that was the subject of the motion only expressly applied to the filing of Alabama's amended complaint pursuant to the grant of Alabama's motion to amend.

*Florida's Second Amended Complaint*; Doc. 223, *Alabama's Second Amended Complaint*.

No Defendants answered Alabama's or Florida's Second Amended Complaint, presumably because, on April 1, 2004, the court stayed the action again in light of the appeal taken by the Defendants of the October 15, 2003 Preliminary Injunction Order. *See April 1, 2004 Order Staying Case*, Doc. 231. However, on April 8, 2004, the Eleventh Circuit stayed that appeal for the limited purpose of allowing this court to consider whether to dissolve or modify the injunction based upon the D.C. Order.

On September 29, 2004, after the motions to lift the preliminary injunction in light of the D.C. Order[7] were under submission, the court held a hearing on whether to lift the injunction. At the hearing on the preliminary injunction, Alabama and Florida informed the court that they wished to amend their complaints again.

On September 30, 2004, because Federal Rule of Civil Procedure 12 has generally abolished special appearances, and because ARC's participation in this case far exceeded the bounds of a special appearance and was, therefore, a general appearance, the court construed ARC's motion to appear specially as a motion to intervene and granted the motion. *See September 30, 2004 Order*, Doc. 257.

On November 8, 2004, the court entered an Order lifting the stay of the case as to all matters not on appeal, and the case has not been stayed again. *See* Doc. 262, *November 8, 2004 Order*. In the same Order, in accordance with Alabama's and Florida's September 29, 2004

---

[7]Georgia and the Federal Defendants also argued that the court should lift the preliminary injunction for a number of reasons other than the entry of the D.C. Order, but the court declined to consider those arguments. *See* Docs. 274 & 275, *Order & Memorandum Opinion*; *Alabama v. United States Army Corps of Eng'rs*, 357 F. Supp. 2d 1313, 1317-18 (N.D. Ala. 2005).

notification that they wished to amend again, the court permitted Alabama and Florida to file motions to amend their complaints by January 7, 2005.  In accordance with that Order, Alabama and Florida timely filed the motions to amend their complaints now before the court, which the Defendants vigorously oppose.

Later, on February 18, 2005, the court entered an Order denying the motions to lift the injunction in light of the D.C. Order.  *See* Docs. 274 & 275, *Order & Memorandum Opinion*; *Alabama v. United States Army Corps of Eng'rs*, 357 F. Supp. 2d 1313, 1317-18 (N.D. Ala. 2005).  That Order is presently on appeal.  *See Georgia's, Florida's, and ARC's Notices of Appeal*, Docs. 283, 294, 295.

## II.  Issues Presented Regarding the Current Motions to Amend

The Federal Defendants argue that the motions to amend are futile because the court lacks jurisdiction over the claims in the amended complaints because those claims do not challenge final agency actions.  In addition, the Federal Defendants argue that the motions to amend are futile because venue is improper as to the amended claims.

Georgia and ARC (referred to as the "Georgia Defendants" only for purposes of this Memorandum Opinion[8]) argue, first, that the court has no jurisdiction to grant the motions to amend because the motions seek to introduce complaints that would create jurisdiction where the court had no jurisdiction before.[9]  According to the Georgia Defendants, the court had no subject

---

[8]Georgia and ARC jointly filed one brief in opposition to both motions to amend.  *See* Doc. 281.  They made clear in their brief that, though they share similar interests in opposing the motions to amend, their positions may differ on the merits of the claims raised in the proposed amended complaints.  *See Georgia Defendants' Brief*, Doc. 281, p. 1.

[9]Upon reading the Defendants' submissions, the court was relieved by the prospect that it might not have jurisdiction over this case.  However, for the reasons stated in this opinion, the

matter jurisdiction to hear the claims in the original complaint because those claims were not based on final agency actions.   The Georgia Defendants further argue that, even if those claims were justiciable, they became moot when the Corps agreed not to execute certain actions challenged in the original complaint.   Therefore, according to the Georgia Defendants, the court lacks jurisdiction over the case, and cannot enter an order granting the motions to amend even if the amended complaints would create jurisdiction.

Second, the Georgia Defendants argue that the motions before the court are improperly cast as motions to amend under Rule 15(a) because they incorporate recent events.  Rather, the Georgia Defendants contend, the motions to amend should be designated as motions to supplement under Rule 15(d) of the Federal Rules of Civil Procedure.  Further, the Georgia Defendants maintain that the "motions to supplement" must be denied for several reasons: (1) because they improperly seek to add separate, distinct, and new causes of action in a case that has been dormant and has become moot; (2) because supplementation is futile based on improper venue as to the new claims; (3) because supplementation is futile because the controversy should fall under the Supreme Court's original, exclusive jurisdiction; and (4) because allowing the motions would prejudice Georgia and the ARC.

Finally, without leave of court, months after briefing on the motions to amend was under submission, and mere days before the hearing on those motions, the Georgia Defendants filed an additional brief suggesting that Alabama's claims are not "valid and bona fide," and accusing Alabama of illegitimately seeking to keep this lawsuit viable.  *See Georgia Defendants'*

---

court finds that it <u>does</u> have jurisdiction.  Therefore, the court will willingly accept its duty to hear the case fairly and fully under the law until the case settles, some action occurs that relieves the court of jurisdiction, or until the court enters a final judgment.

*Supplemental Brief*, Doc. 325. The court will not consider this supplemental filing because Georgia and ARC unfairly waited until a few days before the hearing to spring their arguments on opposing parties and the court, and because they did not seek leave of court to file a supplemental brief on the propriety of granting the motions to amend. Moreover, the Georgia Defendants level their supplemental arguments at the merits of Alabama's proposed amended claims. Those arguments, thus, are not germane to the propriety of permitting amendment.

### III.  Standard of Review

After service of a responsive pleading, "a party may amend the party's pleading <u>only</u> by leave of court . . . and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a) (emphasis added). "'[I]n the absence of any apparent or declared reason–such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.–the leave sought should, as the rules require, be 'freely given.'" *Loggerhead Turtle v. County Council of Volusia, Fla.*, 148 F.3d 1231, 1255 (11th Cir. 1998) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

The Defendants contend that the motions to amend are really motions to supplement. Under Rule 15(d),

> [u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented. Permission may be granted even though the original pleading is defective in its statement of a claim for relief or defense. If the court deems it advisable that the adverse party plead to the supplemental pleading, it shall so order, specifying the time therefor.

As the Eleventh Circuit recognizes, "[a] supplemental pleading is an appropriate vehicle by which to 'set forth new facts in order to update the earlier pleading, or change the amount or nature of the relief requested in the original pleading.'" *Lussier v. Dugger*, 904 F.2d 661, 670 (11th Cir. 1990) (quoting 6A Charles Alan Wright, Arthur R. Miller, & M. K. Kane, 4 *Federal Practice and Procedure* § 1504 (footnotes omitted)).   Regardless of whether the motions are to amend or supplement, the standard of review is the same, with a few exceptions that do not apply in this case.  The court, therefore, will not be sidetracked by a technicality that raises form over substance.  *See* discussion *infra*; *see*, *e.g.*, *Franks v. Ross*, 313 F.3d 184, 198 (4th Cir. 2002); 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1504 (2d ed. 1990) (explaining the difference between a motion to supplement and a motion to amend).

**IV. Discussion**

> **A.  Whether the Court has Subject Matter Jurisdiction Over the Amended Claims**

The Defendants argue that allowing Alabama and Florida to file their amended complaints would be futile because the court has no jurisdiction over the amended claims on several theories, including asserting that the court lacks jurisdiction over the original complaint. Whenever questions surface about the court's subject matter jurisdiction–even fifteen years after the complaint was filed–the court must make a serious and studied examination of the issue. *See Reahard v. Lee County*, 978 F.2d 1212, 1213 (11th Cir. 1992) (noting that a court "always must investigate questions of subject matter jurisdiction, whether or not they are raised by the parties to the case." (citing *Fitzgerald v. Seaboard Sys. R.R.*, 760 F.2d 1249, 1251 (11th Cir. 1985))).

**1. The Supreme Court's Original Jurisdiction**

The Georgia Defendants argue that, because this case involves interstate water allocation,

this suit presents a "controversy between two or more states," and, therefore, falls within the exclusive jurisdiction of the Supreme Court.  Under 28 U.S.C. § 1251(a), "[t]he Supreme Court shall have <u>original **and** exclusive</u> jurisdiction of all controversies between two or more States." (Emphasis added).  In addition "[t]he Supreme Court shall have <u>original **but not** exclusive</u> jurisdiction of . . . [a]ll controversies between the United States and a State."  28 U.S.C. § 1251(b).

At this point, the case does not fall under the Supreme Court's original and exclusive jurisdiction.  Even though the Supreme Court occasionally exercises original jurisdiction in interstate water disputes,[10] 28 U.S.C. § 1251 circumscribes the Supreme Court's original jurisdiction based on the <u>identity of the parties</u> to a dispute, <u>not</u> based on the <u>subject</u> of the dispute between the parties.   Therefore, the Georgia Defendants' argument that "interstate water disputes" automatically fall within the Supreme Court's original exclusive jurisdiction because the general subject implicates states' competing interests in water is misplaced. *See United States v. Nevada*, 412 U.S. 534, 537 (1973) (per curiam) (holding that, in a declaratory judgment action in which the United States sued two states with opposing interests in the federal water allocation decisions at issue and in which the two states did not seek relief from one another, the case fell outside § 1251(a)  jurisdiction); *Mississippi v. Louisianna*, 506 U.S. 73, 78 (1992) (noting that a district court could properly decide a boundary dispute between private parties even though the district court's decision would necessarily determine the boundary line between two states, because § 1251 "speaks not in terms of claims or issues, but in terms of <u>parties</u>") (emphasis

---

[10]*See*, *e.g.*, *Texas v. New Mexico*, 462 U.S. 554 (1983); *New Jersey v. New York*, 347 U.S. 995 (1954).

added).

Just because states pursue opposing interests in a case does not necessarily mean a "controversy" exists between or among them, or that the Supreme Court will exercise original jurisdiction:

> The exclusive jurisdiction of the Supreme court [under 28 U.S.C. § 1251(a)] is limited to cases in which the states are and remain opponents in the controversy, regardless of their formal alignment. [*See*] *United States v. Nevada*, 412 U.S. 534, 538-40 (1973); *California v. Nevada*, 447 U.S. 125, 133.  On the other hand, provided at least one state is on each side of the controversy, the presence of nonstate parties, even indispensable parties, does not affect the exclusive original jurisdiction of the Supreme Court. [*E.g.*], *Arizona v. California*, 373 U.S. 546, 564 (1963); *California v. Arizona*, 440 U.S. 59, 61 (1979)[; *see also*] *Maryland v. Louisianna*, 451 U.S. 725, 735-44 (1981); *Louisiana v. Mississippi*, 516 U.S. 122 (1995) (settling a boundary dispute between Louisiana and Mississippi and denying Louisiana's title claim against a private defendant).  Thus, when the United States and a state are opposing parties–a case of concurrent jurisdiction under 28 U.S.C. § 1251(b)(2)–the Supreme Court nevertheless retains exclusive jurisdiction if the suit also involves a controversy between two states. *[See] California v. Arizona*, [440 U.S. at 67].

Robert L. Stern et al., *Supreme Court Practice* 554-555 (8th ed. 2002) (emphasis in original).

The Supreme Court's characteristically conservative nature regarding its jurisdiction extends even to its statutorily exclusive jurisdiction over controversies between two or more states.  The Supreme Court has commented on its philosophy of invoking its § 1251 original jurisdiction sparingly:

> We construe 28 U.S.C. s 1251(a)(1), as we do Art. III, s 2, cl. 2, to honor our original jurisdiction but to make it obligatory only in appropriate cases. . . . We incline to a sparing use of our original jurisdiction so that our increasing duties with the appellate docket will not suffer.

*Illinois v. City of Milwaukee, Wis.*, 406 U.S. 91, 93-94 (1972) (citations omitted).  The Supreme

Court will only exercise jurisdiction in cases where the issue is first of all "serious."  "'The

model case for invocation of this Court's original jurisdiction is a dispute between States of such

seriousness that it would amount to *casus belli* if the States were fully sovereign.'"  *Mississippi v.*

*Louisiana*, 506 U.S. 73, 77 (1992) (quoting *Texas v. New Mexico*, 462 U.S. 554, 571 (1983)).

Second, the Court considers "the availability of an alternative forum in which the issue tendered

can be resolved."  *Id*.

     Because the Supreme Court's original jurisdiction over controversies between two or

more states is exclusive, it alone has the prerogative to apply the two-part test to decide whether

it will exercise that jurisdiction.  The district court must dismiss the action whenever it involves

"a controversy between two or more states," regardless of whether the case appears to be one

over which the Supreme Court will, in its discretion, exercise jurisdiction.  A controversy

between two or more states exists only when, unlike this case at this time, the states are actually

seeking relief from one another.  *See Mississippi v. Louisiana*, 506 U.S. at 78 n.2 (stating, in

*dicta*, "Louisiana's intervention is also unaffected by § 1251(a) because it does not seek relief

against Mississippi"); *United States v. Nevada*, 412 U.S. 534, 537 (1973) (per curiam).

     This case presents precisely the kind of dispute the Eighth Circuit found to fall outside

the Supreme Court's exclusive jurisdiction in *South Dakota v. Ubbelohde*, 330 F.3d 1014 (8th

Cir. 2003), *cert. denied*, 541 U.S. 987 (2004).  There, the court held that, "the controversy is

between each of the states and the Corps. Although the states would have had adverse interests,

each state would be seeking relief from the Court against the Corps. Thus, allowing intervention

by Nebraska would not strip the District Court of jurisdiction" under § 1251(a).  *Id*. at 1025-26.

The most instructive Eleventh Circuit case on this point is none other than *Georgia v. United States Army Corps of Engineers,* 302 F.3d 1242 (11th Cir. 2002)–a case involving some of the very same issues raised in this case.   In that case, Florida sought to intervene as a defendant in a suit between Georgia and the Corps regarding the Corps' actions as to some of the very same waters at issue in the suit before this court.   The district court denied Florida's motion to intervene, but the Eleventh Circuit reversed.   In so doing, the Eleventh Circuit concluded:

> [P]ermitting Florida to intervene [would] not deprive the district court of jurisdiction over the case.   Indeed, to constitute "a justiciable controversy between the States . . . it must appear that the complaining State has suffered a wrong through the action of the other State, furnishing ground for judicial redress, or is asserting a right against the other State which is susceptible of judicial enforcement according to the accepted principles of the common law or equity systems of jurisprudence." *Massachusetts v. Missouri*, 308 U.S. 1, 15 (1939).  Further, to invoke the Supreme Court's original and exclusive jurisdiction, "a plaintiff State must first demonstrate that the injury for which it seeks redress was <u>directly caused by the actions of another State</u>." *Pennsylvania v. New Jersey*, 426 U.S. 660, 663 (1976). . . .
>
> In this case, there is <u>no such dispute between Florida and Georgia. The states do not seek relief from each other but, rather, want the Corps to act on the water supply request in opposite ways</u>--Georgia seeks to have the Corps grant its request, while Florida wants to have it denied.  Thus, although Florida technically will be a defendant and Georgia a plaintiff, Georgia does not seek redress for any harm caused by Florida, and Florida will not be subjected directly to any ruling of the district court.   Accordingly, permitting Florida to intervene in this case will not deprive the district court of jurisdiction.

*Georgia v. United States Army Corps of Eng'rs*, 302 F.3d at 1256 n.11 (emphasis added).

Similarly, in the case before the court, Alabama and Florida do not seek relief from Georgia or each other but, rather, want the Corps to allocate water in its reservoirs in a different manner than Georgia desires.  Nowhere do Alabama or Florida indicate that their injury was

14

"directly caused by" Georgia; on the contrary, they allege that the Corps is causing their injury by illegally allocating water. Therefore, at this time, this case does not present a "controversy between two or more States" triggering the Supreme Court's exclusive jurisdiction under 28 U.S.C. § 1251.

Instead, this case presents a controversy under 28 U.S.C. § 1251(b)(2) between the United States and states, over which the Supreme Court has original but not exclusive jurisdiction, which it shares with the district courts. As such, this case is similar to *United States v. Nevada*, 412 U.S. 534 (1973), in which the United States filed a declaratory judgment action in the Supreme Court against two states with opposing interests in federal water allocation decisions. There, the Supreme Court looked to the allegations in the complaint and held that, because the two states did not seek relief from one another, "[t]he complaint . . . is not one alleging a case or controversy between two States within the exclusive jurisdiction of this Court. . . but a dispute between the United States and two States over which this Court has original but not exclusive jurisdiction." *Id.* at 537. Only after determining that the case fell outside its exclusive jurisdiction did the Supreme Court look to the subject of the controversy to determine that the suit did not substantially implicate interstate concerns and that it would, therefore, decline jurisdiction in favor of an action in a district court. *Id.* at 538-40.

The Georgia Defendants argue that the court's 2003 Preliminary Injunction converts this case into a controversy between two or more states. As the Georgia Defendants acknowledge, however, the court's Order does not enjoin Georgia, only the Corps. *See Order Granting Preliminary Injunction*, Doc. 192; *Georgia Defendants' Brief*, Doc. 281 at 39 n.2. The Georgia Defendants argue that, "as a practical matter[, the injunction] keeps Georgia from implementing

15

the D.C. Settlement Agreement, and this indirect injunction against Georgia violates 28 U.S.C. §

1251(a) just the same." *Id*. The Georgia Defendants offer no legal support for their theory that

an "indirect injunction" can somehow create a controversy between two or more states or

establish original and exclusive Supreme Court jurisdiction, and the court has found none.

Moreover, given the Supreme Court's innately conservative nature regarding its jurisdiction, this

court will not dismiss the case on creative and unsupported theories suggesting the Supreme

Court's jurisdiction is more expansive than the Supreme Court itself has yet found it to be.

   If this case someday evolves into a controversy between two states, then the court <u>will</u>

have to dismiss for lack of jurisdiction. *See Mississippi v. Louisiana*, 506 U.S. 73, 78  (1992)

("Though phrased in terms of a grant of jurisdiction to this Court, the description of our

jurisdiction as 'exclusive' necessarily denies jurisdiction of such cases to any other federal

court."); *see also Georgia v. United States Army Corps of Eng'rs*, 302 F.3d at 1256 n.11 (noting

that "granting Florida's motion to intervene. . . raises a serious jurisdictional question.

Specifically, the addition of Florida as a defendant in this lawsuit brought by Georgia <u>might</u>

create a suit between two states within the original and exclusive jurisdiction of the Supreme

Court.  <u>If</u> that were true, the district court <u>would be required</u> to dismiss the case for lack of

jurisdiction." (emphasis added).  That day, however, has not arrived.

## 2.  This Court's Jurisdiction Under the Administrative Procedures Act

   The Defendants raise two jurisdictional arguments under the Administrative Procedures

Act.  First, the Georgia Defendants argue that the claims in the original complaint were never

justiciable under the APA because they were not based on final agency actions.  Therefore,

according to the Georgia Defendants, the court never had subject matter jurisdiction over the

case, and cannot enter an order granting the motions to amend even if the amended complaints would fall within the court's jurisdiction.  *See Georgia Defendants' Brief*, Doc. 281, at 23-24.  In response, Alabama and Florida argue that whether the court had subject matter jurisdiction over the claims in the original complaint does not matter now that Alabama has already amended the complaint once, and now that Florida has intervened and previously amended its complaint, as well.  *See Alabama's and Florida's Reply Brief*, Doc. 312, at 21-23.

Second, without explaining *why* the specific allegations in the Third Amended Complaints are "broad programmatic attacks" rather than challenges to "discrete final agency actions," the Federal Defendants argue that the court has no jurisdiction over the amended claims because, under the Administrative Procedures Act, the court can only review final, discrete agency actions.  *See Federal Defendants' Brief*, Doc. 277, at 13-17.

In response, Alabama and Florida list "unlawful agency actions and failures to act by the Corps" drawn from their proposed complaints.  *See Alabama's and Florida's Reply Brief*, Doc. 312, at 23-25.  The parties asserting jurisdiction, *i.e.*, Alabama and Florida, bear the burden of establishing that the court has jurisdiction. *See Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 376 (1994).

### a.) Legal Standard for Court Review of Administrative Action Under the APA.

Ordinarily, the federal government and its agencies are immune from suit.  *See Estrada v. Ahrens*, 296 F.2d 690, 698-99 (5th Cir. 1961).[11]  However, Congress waived the United States' sovereign immunity concerning claims that fall within the scope of the Administrative

---

[11]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Procedures Act, 5 U.S.C. §§ 551-706.  *See* 5 U.S.C. § 702; *see also Estrada,* 296 F.2d at 698.

Under the APA, "[a] person suffering legal wrong because of agency action, or adversely

affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to

judicial review thereof." 5 U.S.C. § 702.  "'[A]gency action' includes the whole or a part of an

agency rule,[12] order,[13] license,[14] sanction,[15] relief,[16] or the equivalent or denial thereof,[17] or failure

---

[12]"'[R]ule' means the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing." 5 U.S.C. § 551(4).

[13]"'[O]rder' means the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing."  5 U.S.C. § 551(6).  "'[R]ule making' means agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5).  For the definition of "licensing," *see infra* note 11.

[14]"'[L]icense' includes the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." 5 U.S.C. § 551(8).

[15]"'[S]anction' includes the whole or a part of an agency--(A) prohibition, requirement, limitation, or other condition affecting the freedom of a person; (B) withholding of relief; (C) imposition of penalty or fine; (D) destruction, taking, seizure, or withholding of property; (E) assessment of damages, reimbursement, restitution, compensation, costs, charges, or fees; (F) requirement, revocation, or suspension of a license; or (G) taking other compulsory or restrictive action." 5 U.S.C. § 551(10).

[16]"'[R]elief' includes the whole or a part of an agency--(A) grant of money, assistance, license, authority, exemption, exception, privilege, or remedy; (B) recognition of a claim, right, immunity, privilege, exemption, or exception; or (C) taking of other action on the application or petition of, and beneficial to, a person." 5 U.S.C. § 551(11).

[17]"The terms following those five categories of agency action are not defined in the APA: 'or the equivalent or denial thereof, or failure to act.' § 551(13). But an 'equivalent ... thereof' must also be discrete (or it would not be equivalent), and a 'denial thereof' must be the denial of

to act."[18]  5 U.S.C. § 551(13).  The legislative material explaining the APA "manifests a congressional intention that it cover a broad spectrum of administrative actions," *see Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99, 105-106 (1977).  However, the APA only permits challenges to discrete agency actions within those categories set forth in 5 U.S.C. § 551(13).  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 & n.2 (1990).

Under the APA, this court may grant two basic types of relief.  First, the court may "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), but only if the agency action to be compelled is an action legally required.  *S. Utah Wilderness Alliance*, 542 U.S. at ___; 124 S. Ct. at 2379.  Thus, if the law requires the Corps to act, but leaves the manner of the action to the Corps' discretion, the court can compel the Corps to act, but the court has no power to specify what the action must be.  *S. Utah Wilderness Alliance*, 542 U.S. at ___; 124 S. Ct. at 2380 (citation omitted); *see also id*., 542 U.S. at ___; 124 S. Ct. at 2379 (stating that § 706(1) "empowers a court only to compel an agency to perform a ministerial or

_____

a discrete listed action (and perhaps denial of a discrete equivalent)."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, ___; 124 S. Ct. 2373, 2378-79 (2004).

[18]"The final term in the definition, 'failure to act,' is in [the Supreme Court's] view properly understood as a failure to take an agency action--that is, a failure to take one of the agency actions (including their equivalents) earlier defined in § 551(13). Moreover, even without this equation of 'act' with 'agency action' the interpretive canon of *ejusdem generis* would attribute to the last item ('failure to act') the same characteristic of discreteness shared by all the preceding items.  A 'failure to act' is not the same thing as a 'denial.' The latter is the agency's act of saying no to a request; the former is simply the omission of an action without formally rejecting a request–for example, the failure to promulgate a rule or take some decision by a statutory deadline. The important point is that a 'failure to act' is properly understood to be limited, as are the other items in § 551(13), to a discrete action." *S. Utah Wilderness Alliance*, 542 U.S. at ___; 124 S. Ct. at 2379.

non-discretionary act, or to take action upon a matter, without directing <u>how</u> it shall act").

Second, as more fully set out in 5 U.S.C. § 706(2), the court may grant relief by holding unlawful and setting aside agency actions, findings, and conclusions the court finds illegal, unconstitutional, unsupported by law or fact, or abusive of agency discretion.  5 U.S.C. § 706.  In addition, to prevent irreparable injury while the court reviews an agency action challenged under the APA, the court may enter orders as necessary to postpone the effective date of the agency action or to preserve the *status quo* or rights pending conclusion of the review proceedings, and the court has done so in this case. *See* 5 U.S.C. § 705; *see also, e.g.*, *February 5, 1992 Order*, Doc. 54; Doc. 192, *October 15, 2003 Preliminary Injunction Order*, pp. 2-4.

Finally, when, as in this case, the plaintiffs seek review only under the general review provisions of the APA–as opposed to seeking review under specific authorization in the substantive statute–the plaintiffs must challenge a <u>final</u> agency action.  *Nat'l Wildlife Fed'n*, 497 U.S. at 882.  The finality requirement comes from 5 U.S.C. § 704, which also provides for review of  "a preliminary, procedural, or intermediate agency action or ruling [*i.e.*, an action that is not final]. . . on the review of the final agency action."  *Id*.

Whether the complaints in this case challenge a final agency action presents an important question because the APA's finality requirement is a jurisdictional prerequisite to judicial review. *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1236 (11th Cir. 2003).  Thus, if the agency actions Alabama and Florida challenge are not final, the court cannot reach the merits of this dispute.  *See id.* (quoting *Indep. Petroleum Ass'n of Am. v. Babbitt*, 235 F.3d 588, 594 (D.C. Cir. 2001) (quoting *DRG Funding Corp. v. Sec. of Hous. & Urban Dev.*, 76 F.3d 1212, 1214 (D.C. Cir.1996))).

20

### b.) APA Jurisdiction Over the Original Complaint.

The Georgia Defendants argue that the court never had jurisdiction over Alabama's original complaint because the complaint did not challenge discrete, final agency actions.  This argument presents two questions for the court to consider: first, whether the court's jurisdiction over the claims in the original complaint matters fifteen years later when Alabama previously amended its complaint, and Florida has intervened and has also previously amended its complaint; and, if so, second, whether the claims in the original complaint were ripe for review in 1990 when Alabama filed the complaint.  Contrary to Alabama's and Florida's arguments in response to the Georgia Defendants, *see Alabama's and Florida's Brief*, Doc. 312, p.22-23, subject matter jurisdiction is never waived, and "[a] federal court must always dismiss a case upon determining that it lacks subject matter jurisdiction, regardless of the stage of the proceedings." *Goodman ex rel. Goodman v. Sipos*, 259 F.3d 1327, 1331 n.6 (11th Cir. 2001).  Further,  "because a federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court must zealously insure that jurisdiction exists over a case, and should itself raise the question of subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises." *See Smith v. GTE Corp.* 236 F.3d 1292, 1299 (11th Cir. 2001) (quoting *Morrison v. Allstate Indem. Co.*, 228 F.3d 1255, 1260-61 (11th Cir.2000)).

### Importance of Jurisdiction Over the Original Complaint

Alabama and Florida argue that the Georgia Defendants' attacks on the court's jurisdiction over Alabama's original complaint are irrelevant because Alabama's Second Amended Complaint superseded the original complaint.  *See Alabama's and Florida's Brief*, Doc. 312, p.21.  The court has found no statute or Eleventh Circuit case directly on point.

21

Of course, the court recognizes that "[d]efective <u>allegations</u> of jurisdiction may be amended, upon terms, in the trial or appellate courts." 28 U.S.C.A. § 1653 (emphasis added). *See Majd-Pour v. Georgiana Cmty. Hosp., Inc.*, 724 F.2d 901, 903 n.1 (11th Cir. 1984) (instructing a district court that, on remand, it should permit plaintiff time for discovery necessary to prove substance of allegations of jurisdiction, but that, if the court found the allegations themselves to be deficient, it should permit the plaintiff to amend because "leave to amend should be freely granted when necessary to cure a failure to <u>allege</u> jurisdiction properly." (emphasis added)).  However, when the court has no jurisdiction over the <u>claims</u> in the original complaint, it must dismiss the case, and it has no jurisdiction to permit an amendment.  *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 832 (1989) (noting that "a change [in the wording of  28 U.S.C.A. § 1653] that would empower federal courts to amend a complaint so as to produce jurisdiction where none actually existed before" would be a departure from the *status quo*); *Stafford v. Mobil Oil Corp.*, 945 F.2d 803, 806 (1991) (holding that, where the jurisdictional defect is actual and substantive rather than  formal, amendment is not allowed (citing *Russell v. Basila Mfg. Co.*, 246 F.2d 432, 433 (5th Cir. 1957))); 3 James Wm. Moore et al., *Moore's Federal Practice* ¶ 15.14 (3rd ed. 2005) ("Essentially a plaintiff may correct the complaint to show that jurisdiction does in fact exist; however, if there is no federal jurisdiction, it may not be created by amendment."); Moore, *supra,* at ¶ 15.30 (noting that the standard for evaluating motions to amend is essentially the same as the standard for allowing motions to supplement);  *see also* Fed. R. Civ. P. 12(h)(3) ("<u>Whenever</u> it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court <u>shall dismiss</u> the action." (emphasis added)); *cf. Tucker v. Phyfer*, 819 F.2d 1030, 1033 (11th Cir. 1987)

(holding that a district court could not allow a motion to intervene to reestablish jurisdiction over a case that became moot when the original class representative lost standing to bring the case). *But see Newman-Green*, 490 U.S. at 832 (noting a district court's power under Rule 21 to dismiss a dispensable, nondiverse party to preserve diversity jurisdiction).  Thus, if the court had no jurisdiction over the original complaint, it had no jurisdiction to permit Alabama to amend in 2003, and it could not create jurisdiction by allowing that amendment.  Therefore, the court concludes that whether it had jurisdiction over the original complaint <u>does</u> matter, despite the fact that Alabama has already amended the complaint once.

As Alabama and Florida point out, Rule 15(d) permits courts to grant motions to supplement pleadings even if the original pleading is defective in stating a claim or defense. Furthermore, to eliminate the rigidity and formalism of needlessly subjecting a plaintiff to the difficulties of commencing a new action even if events occurring after the filing of the original complaint establish a right to relief, the advisory committee notes to Rule 15(d) specifically direct courts to freely allow supplemental pleadings in the interest of justice when the original complaint states no claim for which relief can be granted.  *See* Fed. R. Civ. P. 15 advisory committee's note.  However, the court is not convinced by the Plaintiffs' arguments that the Advisory Committee and the drafters of the Rule intended to instruct courts to allow supplements when no jurisdiction exists over the claims in the original complaint.

In practice, failure to state a claim and lack of jurisdiction often appear related.  Thus, for example, defendants sometimes move for dismissal for failure to state a claim on which relief can be granted because the court lacks subject matter jurisdiction.  In actuality, however, the defense of lack of subject matter jurisdiction, which requires a court to look beyond the pleadings

23

to the substantive question whether jurisdiction <u>actually</u> exists and to resolve doubts in favor of dismissal, is distinct from the defense of failure to state a claim upon which relief can be granted, which requires only a review of the <u>allegations</u> in the complaint as construed in the light most favorable to the plaintiff.   *See also In re Bicoastal Corp.*, 130 B.R. 597 (Bankr. M.D. Fla. 1991) (discussing the relationship between the defenses of lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted).  *Compare* 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1355-56 (2d ed. 1990) (describing the historical derivation of a motion to dismiss for failure to state a claim upon which relief can be granted, pointing out that such a motion is distinct from other Rule 12 motions, and noting that such a motion is leveled only at the <u>formal</u> sufficiency of the <u>allegations</u> in the complaint), *with* Wright & Miller, *supra*, at § 1350 (noting that a motion to dismiss for lack of subject matter jurisdiction presents the fundamental, <u>substantive</u> question of whether subject matter jurisdiction <u>actually</u> <u>exists</u>).

The two defenses are not merely distinct in theory, however.  The Federal Rules clearly distinguish them from one another.  *See* Fed. R. Civ. P. 12 (setting out failure to state a claim for which relief can be granted as a separate defense from lack of subject matter jurisdiction). Because the Rules themselves do not conflate failure to state a claim and lack of subject matter jurisdiction, but instead unambiguously recognize them as distinct defenses, the Rule and the advisory committee notes would have referred to both defenses explicitly if they were meant to instruct courts to allow supplementation when a complaint fails to effectively state a claim <u>and</u> when no jurisdiction exists over the claims in the original complaint.  Rather than containing such a reference, however, the advisory committee notes unequivocally state that the amendment

to Rule 15(d) expressly permitting a supplemental pleading where an original pleading fails to state a viable claim for relief "does <u>not</u> attempt to deal with such questions as the relation of the statute of limitations to supplemental pleadings, the operation of the doctrine of laches, <u>or the availability of other defenses</u>." *See* Fed. R. Civ. P. 15 advisory committee's note (emphasis added). Therefore, and in light of the authority set out *supra* regarding the court's inability to allow a party to create jurisdiction by amendment or supplement, the court finds that Rule 15(d) does not allow it to permit supplements when it has no jurisdiction over the original claims.

For the reasons stated above, if indeed the court never had jurisdiction over any of the allegations in the original complaint, the court had no jurisdiction to enter any of the subsequent orders it has entered over the last fifteen years or to grant motions to amend and to intervene, and it has no jurisdiction today. On the other hand, if the court had subject matter jurisdiction over at least one of the claims in the original complaint, the court had jurisdiction to enter various orders and allow subsequent amendments, and it has jurisdiction to consider the motions to amend now before it. Accordingly, the court concludes that jurisdiction over the claims in the original complaint is a prerequisite to its jurisdiction to consider the motions to amend.

### Finality of Agency Actions Challenged in the Original Complaint

Because the court is of the opinion that whether the court had jurisdiction over the original complaint <u>does</u> matter, the court sets forth below the reasons why the original complaint challenges at least one final agency action and triggers subject matter jurisdiction.

As a preliminary note, from a jurisdictional standpoint, Alabama's original complaint was very poorly drafted. Thus, the court sympathizes with the Federal Defendants' and Georgia's difficulty in figuring out what agency actions Alabama challenged in each count of the

25

complaint.  However, having reviewed the complaint carefully, the court disagrees with the

Defendants' conclusions as to what agency actions Alabama challenged in the original

complaint.[19]

Among other things, Alabama based its original complaint on the following alleged

Corps activities:[20]

a.) entering into water withdrawal contracts with ARC, Gwinnett County, Georgia, and

the cities of Gainesville, Buford,[21] and Cumming, Georgia, to allow the

withdrawal of water from Lake Lanier at an average of 327 thousand gallons per

day and at a peak rate of 377 million gallons per day (MGD), *see Alabama's*

*Original Complaint,* Doc. 1, at ¶11;

b.)  entering into two contracts for water supply storage at Lake Allatoona, *see id.*;

c.) submitting a final Reallocation Report and Environmental Assessment reviewing the

impacts of reallocating water in Carters Lake to its Division Engineer for

intermediate-level approval and submission to the Corps' Chief of Engineers for

final approval without considering, at any point, objections Alabama made to the

draft Report and draft Assessment when they were submitted to the public for

comment and review, *see id.* at ¶ 15;

---

[19] In their briefs and in a handout and which Georgia presented to the court at the June 30, 2005 hearing, the Defendants set out their understanding of what agency actions Alabama's original complaint challenged.

[20]The court does not view the list given here as necessarily exhaustive.

[21]Alabama referred to "Bufford," Georgia in its complaint, but at the hearing, on the court's inquiry, Alabama confirmed that it intended to refer instead to <u>Buford</u>, Georgia, a town northeast of Atlanta near Lake Lanier.

d.) planning to issue a draft Reallocation Report and draft Environmental Assessment for Lake Allatoona for public comment and review without the benefit of a basin-wide study assessing the potential impacts on the entire Alabama-Coosa-Tallapoosa (ACT) river basin, and planning to subsequently submit the final Draft Reallocation Report and Environmental Assessment reviewing the impacts of reallocating water in Carters Lake to its Division Engineer for intermediate-level approval and submission to the Corps' Chief of Engineers for final approval without considering, at any point, Alabama's objections to the Report and Assessment that Alabama planned to make at the public comment stage, *see id.* at ¶ 16;[22]

e.) releasing for public comment and review a draft Post Authorization Change (PAC) Notification Report and draft Environmental Assessment proposing an 85 MGD increase in withdrawals from Lake Lanier,[23] *see id.* at ¶ 17;

f.) issuing interim water supply contracts to Cumming and Gainesville authorizing the withdrawal of water from Lake Lanier [24] before finalizing the PAC Report and Environmental Assessment and obtaining Congressional approval of the proposed 85 MGD increase in withdrawals from Lake Lanier, *see id.*;

---

[22]For obvious reasons, the alleged future activities listed under (d.) are probably the ultimate examples of agency "actions" that are <u>not</u> final.

[23]The Corps could not implement the 85 MGD increase until it submitted a final proposal to Congress and procured Congressional approval.

[24]Alabama admits that the Corps, Cumming, and Gainesville never signed the interim water supply contracts referenced in ¶ 17 of the original complaint. *See Alabama's Supplemental Brief*, Doc. 328 at 3-4.

g.)  proposing a two-phased Comprehensive Studies Plan to Congress; in phase one, the Corps would reallocate water from Carters Lake, Lake Lanier, and Lake Allatoona ("the Lakes") to satisfy water supply needs within Georgia, and, in phase two, the Corps would prepare a comprehensive management plan for the entire basin; thus, according to Alabama, certain unnamed common law rights would vest in Georgia citizens in phase one, preventing Alabama from later remedying any damage caused it by phase one, *see id.* at ¶ 18-19;

h.) in considering how to allocate water withdrawals from the Lakes, failing to consider the impact of already-authorized future reservoirs to be constructed on rivers and tributaries in Georgia in the ACF and ACT river basins, *see id.* at ¶ 20;

i.) in considering increases in water withdrawals from Lake Lanier, failing to consider the potential impact that would result if Georgia authorities granted Atlanta's petition for an increase in the amount of pollution Atlanta could release into the ACF basin, *see id.*, at ¶ 21;

j.) in preparing the proposed Reallocation Reports for Carters Lake and Lake Allatoona, and in preparing the PAC Notification Report for Lake Lanier, failing to prepare an Environmental Impact Statement (EIS) when required, and failing to develop an adequate evidentiary record to support the Corps' position that no EIS was required, *see id.* at ¶ 33; and

k.) in preparing Environmental Assessments, failing to properly consider potential impacts on the ACF and ACT basins, and failing to develop an adequate evidentiary record, *see id.* ¶ 34.

28

Based on the above-listed activities and actions by the Corps, Alabama alleged five causes of action in its original complaint. At most, only a few of the above-listed agency actions that Alabama challenged in its original complaint appear on initial observation to be final, discrete, challengeable agency actions.  As subsequently discussed, however, entering into contracts (see a. and b. above) satisfies the requirements of a final agency action.  Of Alabama's five original causes of action, only one, the Third Cause of Action, clearly challenges those contracts, *see Alabama's Original Complaint*, p. 22-23, ¶ 41, & p. 28 ¶ 2, as well as other contracts and proposed contracts mentioned in the complaint.

In their submissions and during the hearing, Georgia and the Corps represented that *none* of the contracts specifically referenced in the complaint had ever been finalized and that all those contracts had been withdrawn.  *See*, *e.g.*, *Hearing Transcript* at 30-31.  However, because of the confusion created by the parties and by the poor draftsmanship of the complaint, the status of <u>all</u> the contracts referenced in the amended complaint remained obscured until the court specifically inquired into matter at the June 30, 2005 hearing and permitted additional submissions on this issue.  At the court's direction, the parties have finally, for the most part, cleared up that confusion.  The contracts listed above fall into three main categories: (1) contracts never finalized by the parties to them; (2) contracts that had expired by June 28, 1990 when Alabama filed its complaint, some of which the Corps continues to honor despite their expiration; and (3) contrary to some of the parties' earlier representations to this court, *see*, *e.g.*, *Hearing Transcript* at 30-31, contracts that were in effect in 1990 and remain in effect today.

The interim contracts with Cumming and Gainesville for water supply from Lake Lanier listed in (f.) above either had expired at the time Alabama filed suit on June 28, 1990, or were

merely proposed contracts that the parties to those contracts never finalized.  The Corps

withdrew the proposed interim contracts, but continued to operate on the expired contracts it had

intended to replace with the proposed interim contracts for Lake Lanier, and made changes to

those expired but operative arrangements over time.  *See All Defendants' Joint Supplemental*

*Brief*, Doc. 327, at 8; *Alabama's Supplemental Brief*, Doc. 328 at 3-4.  Alabama argues that the

expired contracts under which the Corps continued to operate constituted licenses challengeable

under the APA.  *See Alabama's Supplemental Filing*, Doc. 328, p. 4 n.2.  The court, however,

does not need to reach that argument because the parties do not dispute that at least two sets of

contracts listed in (a.) and (b.) above were in effect in 1990 and remain in effect today:

permanent water supply contracts from Lake Lanier for Buford and Gainesville, and the two

storage contracts for Lake Allatoona.[25]  *See All Defendants' Joint Supplemental Brief*, Doc. 327,

at 4-9.

  In their supplemental filing, the Corps and the Georgia Defendants now argue that, three

days after Alabama filed suit,

> [o]n. . . July 2, 1990, the Corps issued a draft Water Supply
> Reallocation Report and Environmental Assessment proposing to
> permanently reallocate additional storage in Lake Allatoona. . . .
> These new storage contracts that the Corps proposed to execute for
> Lake Allatoona, and not the existing Allatoona contracts, were the
> subject of the causes of action that Alabama asserted in the 1990
> complaint.

---

[25]Paragraph Eleven of the original complaint described <u>existing</u> contracts, including the
contracts for water supply storage from Lake Allatoona, not <u>proposed</u> contracts.  *See Alabama's*
*Orgininal Complaint*, Doc. 1, ¶ 11 ("The Corps <u>entered</u> into one or more contracts. . . to permit
the withdrawal of water from Lake Lanier. . . . [<u>A</u>]t the present time, the Corps <u>has not entered</u>
into any contracts for water withdrawal of water from Carters Lake. . . . [T]here <u>are</u> two contracts
for water supply storage at Lake Allatoona.") (emphasis added).

*All Defendants' Joint Supplemental Brief*,[26] Doc. 327, p. 6.  The court is convinced that, as the

Defendants' argue, the Third Cause of Action of the original complaint did challenge the Corps'

<u>proposals</u> and <u>intended</u> <u>proposals</u> to permanently reallocate additional storage in Lake Lanier,

Carters Lake, and Lake Allatoona, and the Corps' <u>intent</u> to issue contracts in conformance with

those proposals without first complying with NEPA.  *See Alabama's Original Complaint*, Doc.

1, ¶ 38.  However, in addition, having thoroughly reviewed the complaint and the parties'

submissions, and having questioned the parties in detail at the hearing, the court finds that,

contrary to the Defendants' argument, Alabama's original Third Cause of Action also challenged

the <u>existing</u> contracts governing the withdrawal from the Lakes, as referenced in paragraph

eleven of the original complaint.

---

[26]Because of the monumental importance of the Corps' admission at the hearing that two
of the Lake Allatoona contracts challenged in the complaint were final agency actions in effect in
1990 and remain in effect today, upon the Corps' request, the court permitted the Corps
additional time to consult with Alabama and its own records to verify that its representations
regarding the contracts were, in fact, correct, and to submit an additional filing <u>only</u> to verify the
Corps' representations as to those contracts.  *See  Hearing Transcript*, pp. 71-72.

In their post-hearing <u>joint</u> supplemental submission to the court, while admitting the
continued existence of those contracts, the Federal Defendants, Georgia, and the ARC argue that
the original complaint failed to state a cause of action based on those Lake Allatoona contracts
because the statute of limitations had expired, and because NEPA did not apply to the decision to
enter into them. Because the additional arguments presented exceed the scope of the court's
consent to an additional submission, the court will not consider them.  The court further notes
that it did not need, desire, permit, or request any additional briefing from Georgia and ARC.
*See Hearing Transcript*, pp. 71-73.

Moreover, the additional arguments assert defenses to the contract-based claims or tardy
arguments for dismissal of claims in the original complaint for failure to state a claim–not
arguments regarding the court's subject matter jurisdiction over the complaint.  *See* Fed. R. Civ.
P. 12 (differentiating between motions to dismiss for lack of jurisdiction and motions to dismiss
for failure to state a claim upon which relief can be granted).  As counsel for Alabama correctly
noted at the hearing, "this horse has been beaten to death."  *See Hearing Transcript*, p. 73.  Thus,
while the court willingly considers jurisdictional questions whenever they arise, it will not
consider arguments that are <u>not</u> jurisdictional submitted after the hearing and long after the time
for briefing has passed.

In the last paragraph under the Third Cause of Action, Alabama alleged that, "under the circumstances set forth in Paragraphs 1 through 40 [of the complaint], the Defendants have violated NEPA by issuing contracts for the withdrawal of water from Carters Lake, Lake Allatoona, and Lake Lanier without making any attempt to comply with NEPA by conducting the necessary environmental review." *Alabama's Original Complaint*, Doc. 1, ¶ 41 (emphasis added). Thus, consistent with Alabama's representation at the June 30 hearing, *see Hearing Transcript* at 48-49, Alabama's original Third Cause of Action challenged both proposed contracts and contracts already issued for all three lakes. The only contracts for water withdrawal from Lake Allatoona[27] that were already issued and that were referenced in the complaint were the two contracts found in paragraph eleven and referenced in (b.) above. These contracts were in effect in 1990 and are still in effect today, as acknowledged by the Corps at the hearing and in its supplemental brief. Therefore, the Third Cause of Action challenged the Corps' entry into those contracts for water supply storage at Lake Allatoona without first complying with NEPA.

Further, contrary to Georgia's arguments, Alabama did request relief based on the Corps' alleged failure to comply with NEPA before entering into the contracts challenged in Count Three of the complaint. Alabama requested in its "Prayer for Relief" that the court issue a "judicial declaration that the Defendants have violated NEPA by failing to comply with NEPA before entering into water supply contracts for the withdrawal of water from Carters Lake, Lake Allatoona, and Lake Lanier." *See Alabama's Original Complaint*, Doc. 1, p. 28, ¶ 2.

Because the court need only have jurisdiction over one claim in the original complaint to

---

[27]As Alabama demonstrated by the evidence presented in its supplemental filing, the two Lake Allatoona "water supply storage contracts" were for water supply withdrawals. *See* Doc. 328, Exs. A & B.

have jurisdiction to grant the motions to amend, the court will limit the discussion to whether

Count Three creates jurisdiction by challenging a final agency action.  The Georgia Defendants

cite the two-part test for finality announced in *Bennett v. Spear*, 520 U.S. 154 (1997).   Under

*Bennett*, to be a final agency action, "[f]irst, the action must mark the consummation of the

agency's decisionmaking process. . . .  And second, the action must be one by which rights or

obligations have been determined, or from which legal consequences will flow."  *Bennett*, 520

U.S. at 177-78.

The Supreme Court decided *Bennett* in 1997, long after Alabama filed suit in 1990.  In

examining subject matter jurisdiction, the court evaluates jurisdiction as of the time Alabama

filed the complaint.  *See Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1352 (11th

Cir. 1997).  Thus, the court should not apply post-complaint law to test jurisdiction over the

claims in Alabama's original complaint.  However, the court finds that the *Bennett* test restates

prior law that existed in 1990, and, therefore, is not a new test.

The Supreme Court drew part one of the *Bennett* test from a 1948 case, *Chicago &*

*Southern Air Lines, Inc. v. Waterman Steamship Corp.*, 333 U.S. 103, 113.  *See Bennett*, 520

U.S. at 177-78.  The Court drew part two of the *Bennett* test from a 1970 case, *Port of Boston*

*Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71.  *See Bennett*, 520

U.S. at 178.  Further, even after *Bennett*, the Eleventh Circuit Court of Appeals has continued to

consider certain factors from the Supreme Court's pre-*Bennett* jurisprudence.  *See TVA v.*

*Whitman*, 336 F.3d 1236, 1248 (11th Cir. 2003); *Atlanta Gas & Light Co. v. FERC*, 140 F.3d

1392, 1404 (11th Cir. 1998).

Thus, to be a final agency action in 1990 and today, the action must have satisfied the

first part of the *Bennett* test for finality by marking the "consummation" of the agency's decision-

making process. *Bennett*, 520 U.S. at 177-78 (quoting *Chicago & S. Air Lines*, 333 U.S. at 113);

*see, e.g., Avella v. United States Army Corps of Eng'rs*, No. 89-100064-CIV-KING, 1990 WL

84499 at *1 (S.D. Fla. Jan. 22, 1990) (applying *Chicago & S. Air Lines* to determine whether an

action taken by the Corps was a final agency action).  The action must not have been "of a merely

tentative or interlocutory nature," but, rather, it must have been a "'definitive statement on the

subject matter it addressed.'"  *See Bennett*, 520 U.S. at 177-78 (interpreting *Chicago & S. Air

Lines*); *Chicago & S. Air Lines,* 333 U.S. at 112-13 (holding that an agency action that was not a

"final determination," but "merely a step" in the process of reaching a final decision was not a

final agency action where the action was still subject to review, amendment, and approval);

*Aeromar, C. Por A. v. DOT*, 767 F.2d 1491, 1493 (11th Cir. 1985).  The court cannot disrupt an

agency's orderly decision-making process by intervening to correct temporary or interlocutory

agency actions or conclusions before the agency reaches a definitive position on an issue.  *See* 5

U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly

reviewable is subject to review on the review of the final agency action."); *Port of Boston*, 400

U.S. at 71; *see, e.g. Barnes Freight Line, Inc. v. Interstate Commerce Comm'n*, 569 F.2d 912,

918-919 (11th Cir. 1978) (holding that reinstatement of a motor carrier's temporary operating

authority was a final decision; but reinstatement of the motor carrier's <u>application</u> for permanent

operating authority was not final because the Commission had yet to reach a definitive position

on whether it would grant permanent operating authority).

  Further, to be a final agency action at the time Alabama filed its complaint, the action

must also have satisfied the second part of the *Bennett* test: it must have been an action by which

"rights or obligations have been determined," or from which "legal consequences will flow." *See Bennett*, 520 U.S. at 177-78 (quoting *Chicago & S. Air Lines*, 333 U.S. at 113; *Port of Boston*, 400 U.S. at 71); *see, e.g., Avella*, 1990 WL 84499 at *1 (applying *Port of Boston* to determine whether an action taken by the Corps was a final agency action).  In other words, the challenged action must "directly affect the parties." *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1237 (11th Cir. 2003) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)).  An action that does not itself adversely affect a plaintiff, but only adversely affects his rights on the contingency of future administrative action, is not a final agency action.  *See id.* (quoting *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 288 (5th Cir.1999) (quoting *Rochester Tel. Corp. v. United States*, 307 U.S. 125, 130 (1939))).

Both before and after *Bennett*,[28] in addition to examining whether a challenged agency action satisfies the two elements of the *Bennett* test, courts have "interpreted the 'finality' element in a pragmatic way" by considering a number of factors.  *See FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239 (1980) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99, 105-106 (1977)).  Those factors have included

> whether the action is a definitive statement of the agency's position; whether the action had the status of law and immediate compliance with its terms was expected; whether the action has a direct impact on the day-to-day business of the plaintiff; and whether the preenforcement challenge was calculated to speed enforcement and prevent piecemeal litigation.

---

[28]For Eleventh Circuit cases decided after *Bennett* that relied on the factors listed *infra*, see, e.g., *TVA v. Whitman*, 336 F.3d 1236, 1248 (11th Cir. 2003); *Atlanta Gas & Light Co. v. FERC*, 140 F.3d 1392, 1404 (11th Cir. 1998).

*See Am. Paper Inst., Inc. v. EPA*, 726 F. Supp. 1256, 1259 (S.D. Ala. 1989) (summarizing the factors considered by the Supreme Court in *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 239-40 (1980), and *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99, 105-106 (1977));  *Standard Oil Co.*, 449 U.S. at 239.

The Corps' entry into the two contracts for water supply storage in Lake Allatoona was a <u>discrete</u> action.  Entering into a contract is not a broad program or general mode of operation, such as that challenged in *Lujan*, but a specific, individually distinct action.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 & n.2 (1990) (holding that the National Wildlife Federation could not bring a generic challenge alleging that the Bureau of Land Management's entire "land withdrawal program" was generally flawed, but not challenging "some specific order or regulation," or the application of "some particular measure across the board").

Moreover, the Corps' entry into the contracts was a <u>final</u> agency action.  Entering into the contracts was not merely an interlocutory step in the administrative process, but a definitive statement of the Corps' position permitting water withdrawal and water storage without the need for further agency review.  The contracts "had the status of law," *see Am. Paper Inst., Inc. v. EPA*, 726 F. Supp 1256, 1259 (S.D. Ala. 1989), in the sense that they were enforceable by law and, by law, Alabama and other third parties could not interfere with them.  Furthermore, by challenging the contracts, Alabama would not slow the agency's process of deciding whether to enter into the contracts by interjecting court review into an interim step of that process.  Instead, entering into the contracts marked the consummation of the Corps' decision to allocate water storage at Lake Allatoona.  Even if the Corps intended the contracts to be temporary, they nevertheless consummated a decision to allow temporary withdrawals and storage.  *Cf. Barnes*

*Freight Line, Inc. v. Interstate Commerce Comm'n*, 569 F.2d 912, 918-919 (11th Cir. 1978)

(holding that reinstatement of a motor carrier's <u>temporary</u> operating authority <u>was</u> a final

decision); *see also Hearing Transcript* at 48-49 (where the Corps acknowledged that entering

into the two Lake Allatoona water storage contracts constituted final agency action).

 In addition to marking the consummation of a final agency action, entering into the water

supply and water withdrawal contracts was an act that, by its very nature, determined rights and

obligations and had legal consequences, which is precisely what contracts do.  The rights,

obligations, and legal consequences established by the contracts allegedly damaged Alabama's

day-to-day business because the contracts permitted water withdrawals and allocated water

withdrawal upstream from Alabama allegedly without proper consideration for downstream

environmental impacts.

 Because entering into the contracts was a discrete action that marked the consummation

of the agency's decision-making process, and because the water supply and water withdrawal

contracts determined rights and obligations and had legal consequences, the Corps' entry into

those contracts constituted a final agency decision.  *See Bennett v. Spear*, 520 U.S. 154, 177-78

(1997) (quoting *Chicago & S. Air Lines*, 333 U.S. at 113; *Port of Boston Marine Terminal Ass'n*,

400 U.S. at 71).  Thus, the court had jurisdiction over the Third Cause of Action in Alabama's

original complaint.  Therefore, so long as Alabama's Third Cause of Action did not become

moot, the court had jurisdiction in 2003 to permit Florida to intervene and Alabama to amend its

complaint, and the court now has jurisdiction to consider the pending motions to amend.

 ***Mootness***.  Even if the claims in the original complaint were justiciable under the APA,

the Georgia Defendants argue that they became moot when the Corps agreed in 1992 to withdraw

37

the Water Supply Reallocation Reports, Environmental Assessments, and draft PAC Notification Report. *See Georgia Defendants' Brief*, Doc. 281, pp. 3-4, 19, 24-26. The Georgia Defendants also argue that the claims in the original complaint became moot when the Corps finished its ACT/ACF Comprehensive Study in 1998. Finally, the Georgia Defendants argue that the original complaint became moot because the court can no longer grant the relief requested in the original complaint. Therefore, according to the Georgia Defendants, the court no longer had jurisdiction in 2003 when it granted Florida's motion to intervene or Alabama's first motion to amend.

None of the Georgia Defendants' mootness arguments addresses the Corps' entry into water storage and water supply contracts. Because the court has jurisdiction over the original complaint based on Alabama's NEPA challenge to those contracts, the Defendants' mootness arguments are inapposite. Further, the Corps has recognized on the record that at least two of the contracts challenged in Count Three of Alabama's original complaint are still in effect, and, as discussed above, those two contracts <u>were</u> discrete, final agency actions challengeable under the APA. *See Hearing Transcript* pp. 49-50; *All Defendants' Joint Supplemental Brief*, Doc. 327, pp. 5-7, 14. Thus, at least one claim supporting this court's jurisdiction is not moot, and the court has jurisdiction to consider the motions to amend.

### c.) Futility of Amendments and APA Jurisdiction Over the Proposed Amended Complaints.

The Federal Defendants argue that the proposed amendments would be futile because, under the APA, the court has no jurisdiction over the amended claims. The Corps argues that the amended claims are "broad programmatic attacks" impermissible under the Administrative

Procedures Act.  *See Federal Defendants' Brief*, Doc. 277, at 13-17.  As noted above, a person

bringing an action under the APA must challenge discrete, final agency actions, and may not

bring claims that are merely broad, generic attacks on entire administrative programs.  *See Lujan*

*v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 & n.2 (1990).  The Corps does not explain *why* the

specific allegations in the Third Amended Complaints are "broad programmatic attacks" rather

than challenges to "discrete final agency actions."  In response, Alabama and Florida list specific

"unlawful agency actions and failures to act by the Corps" from their proposed amended

complaints.  *See Alabama's and Florida's Reply Brief*, Doc. 312, at 23-25.

　　　　Particularly under *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990), and *Norton v. S.*

*Utah Wilderness Alliance*, 542 U.S. 55, 124 S. Ct. 2373 (2004), the court has concerns about

whether it can exercise jurisdiction over <u>all</u> the proposed amended claims.  However, those

concerns do not necessarily preclude granting the motions to amend or supplement claims.

Alabama's proposed amended complaint is 80 pages long; Florida's is 79 pages.  Because the

case is before the court on motions to amend, the court does not have to decide <u>at this point</u>

whether it has jurisdiction over *every* claim in the amended complaints, but whether the motions

to amend should be denied because they would be futile.  If jurisdiction is good as to one claim

in a proposed amended complaint, then amendment is not entirely futile.

　　　　Though the court had some difficulty figuring out exactly which agency actions Alabama

is challenging in a few of Alabama's amended claims, Alabama has clearly challenged some

final, discrete agency actions.  For example, in its proposed amended complaint, Alabama

challenges, *inter alia*, the Corps' entry into water supply contracts and water storage contracts

without first complying with NEPA, *see* Doc. 270, Ex. A, *Alabama's Proposed Amended*

*Complaint*, at p. 57, ¶ 118.  As discussed above, the Corps' entry into at least some of those contracts constituted discrete, final agency actions that are not moot.  Therefore, the court has jurisdiction over at least one claim in Alabama's amended complaint, and allowing Alabama to amend would not be futile.

Florida's proposed amended complaint presents more of a challenge to evaluate for jurisdiction because the court cannot tell exactly which agency actions are challenged under <u>any</u> claim.  Nevertheless, the court is not convinced at this point, based on the Defendants' conclusory arguments, that allowing Florida to amend would be futile.  In so holding, the court is not precluding the Defendants from challenging the court's jurisdiction over Florida's amended complaint after Florida files it.[29]

Because Alabama and Florida bear the burden of proof as to subject matter jurisdiction, the court directs Alabama and Florida to make clear in their amended complaints *exactly* which agency actions they are challenging under *each* claim, and to make other revisions *only* as necessary to clarify this court's jurisdiction.  As the court assured Georgia and warned the Plaintiffs at the June 30, 2005 hearing, *see Hearing Transcript*, pp. 44, 74, this case must proceed to a resolution, and the court will not continue to allow further amendments.

## B.  Whether Venue is Proper as to the Amended Claims

The Federal Defendants argue that amendment would be futile because venue is improper as to the amended claims.  Alabama and Florida argue that the Federal Defendants waived the defense of improper venue as to the amended claims because the Federal Defendants did not

---

[29]Indeed, the Defendants may properly challenge many of the alleged claims in both the amended complaints.  By allowing these amendments, the court does not predetermine the success of any of the asserted claims or defenses to them.

raise a venue defense when Alabama filed its original complaint in 1990. Further, Alabama and

Florida argue that venue is proper as to the amended claims.

## 1. Waiver

The court first considers the Plaintiffs' argument that the Federal Defendants waived the

defense of improper venue. Under Federal Rule of Civil Procedure 12(h),

> A defense of... improper venue... is waived (A) if omitted from a
> motion in the circumstances described in subdivision (g),[30] or (B) if
> it is neither made by motion under this rule nor included in a
> responsive pleading or an amendment thereof permitted by Rule 15(a)
> to be made as a matter of course.

The Federal Defendants argue that they did not waive venue because, first, venue must be

proper as to each claim, including claims in an amended complaint, and, second, because the

venue statute changed in late 1990 so that the venue objections now available to the Federal

Defendants differ from the venue objections available to them when Alabama filed the suit.  *See*

*Federal Defendants' Brief*, Doc. 277, at 12.

On December 1, 1990, Congress enacted the Judicial Improvements Act of 1990.  Among

other things, this act amended 28 U.S.C. § 1391(e), the portion of the venue statute applicable to

this action.  The 1990 amendment eliminated the provision in § 1391(e) that the United States

could be sued in any district "in which the claim arose."  The Federal Defendants argue that,

because the venue statute changed after 1990, the venue objections available to them now are

different than the venue objections available to them when Alabama filed suit.  *See Federal*

*Defendants' Brief*, Doc. 277, at 12.  However, the amendment did not give rise to new venue

objections in this case because the amendment did not change the language in the venue statute

--------

[30]That is, the party's first Rule 12 motion.

permitting suit against the United States wherever "the plaintiff resides if no real property is

involved in the action," which is the provision under which Alabama seeks to establish venue.

*See Penrod Drilling Co. v. Johnson*, 414 F.2d 1217, 1224 n.27 (11th Cir. Tex. 1969) (setting

forth text of 1969 version of statute, which permitted suit under § 1391(e) where "the plaintiff

resides if no real property is involved in the action."). Therefore, the Federal Defendants'

argument that the 1990 amendments to § 1391 gave rise to new venue objections is jejune.

No party has cited Eleventh Circuit precedent on whether amending or adding claims

creates an opportunity for new venue objections. However, the court recognizes that venue must

be proper as to every cause of action asserted.[31]  For the reasons stated in this opinion, the court

finds that venue is good as to the new claims in the amended complaints. Thus, the Federal

Defendants have no valid venue objections to make as to the amended claims even if they

technically have not waived them, and the court need not address whether the Federal Defendants

waived all venue defenses as to the amended claims by failing to object to venue after Alabama

filed its original complaint.

**2. Proper Venue as to the Amended Claims**

The Federal Defendants argue that the motions to amend are futile because venue is

improper as to the amended claims.  In response, Alabama and Florida argue that venue is proper

---

[31]*See* 17 James Wm. Moore et al., *Moore's Federal Practice* ¶ 110.05 (3rd ed. 2005); *see also id.* at ¶ 110.06 (["I]f the plaintiff files an amended complaint adding additional. . . claims, venue rules must be satisfied for that complaint.  An amended complaint is treated as a new action. . . and[,] therefore[,] a determination must be made as to whether the chosen district is one in which the action 'may be brought.'"). *But see id.* at ¶ 110.05 (noting that the rule requiring venue to be proper as to each cause of action is not very restrictive because, "[s]ince *Hurn v. Oursler*[, 289 U.S. 238 (1933)], . . . factually interrelated claims have been considered to be one cause of action with two grounds for relief.  If venue is proper for one ground, this will support adjudication of the related ground").

as to the amended claims under 28 U.S.C. § 1391(e).  Under that section,

> [a] civil action in which a defendant is an officer or employee of the
> United States or any agency thereof acting in his official capacity or
> under color of legal authority, or an agency of the United States, or
> the United States, may, except as otherwise provided by law, be
> brought in any judicial district in which (1) a defendant in the action
> resides, (2) a substantial part of the events or omissions giving rise to
> the claim occurred, or a substantial part of property that is the subject
> of the action is situated, or (3) the plaintiff resides if no real property
> is involved in the action.

28 U.S.C. § 1391(e) (emphasis added).

The term "the plaintiff" as used in 28 U.S.C. § 1391(e) is universally accepted to mean

"any plaintiff."  *See Sidney Coal Co. v. Massanari*, 221 F. Supp. 2d 755, 776-77 (E.D. Ky. 2002)

(collecting cases). However, because Alabama was the only Plaintiff at the time of the filing of

this action, and because § 1391(e) governs where civil actions "may be brought," the propriety of

venue under § 1391(e) in this case is dependant on the propriety of venue as to Alabama's

claims.  The Defendants have disputed venue as to Florida's claims only insofar as it depends on

venue as to Alabama's claims.  Thus, the court need only address the propriety of venue as to

Alabama's claims.

Alabama and Florida bear the burden of establishing the propriety of venue, as does any

plaintiff when a defendant challenges venue.  *See Rogers v. Civil Air Patrol*, 129 F. Supp. 1334,

1336 (M.D. Ala. 2001).  Whenever a plaintiff brings a case in an improper venue, the court must

dismiss the case, or, in the interest of justice, transfer the case to a forum in which the plaintiff

could have filed it originally.  28 U.S.C. § 1406.

The Federal Defendants argue that venue is improper because no Defendant in the action

resides in Alabama and a substantial part of the events or omissions giving rise to the claim did

not occur here.  The court does not need to address those arguments because the Plaintiffs have

not sought to establish venue under § 1391(e)(1) or (2).  Rather, Alabama and Florida maintain

that venue is proper under § 1391(e)(3), which provides that, in an action against the Federal

Government, venue lies where the plaintiff resides.  Section 1391(e) reads in the disjunctive by

using the word "or," and not in the conjunctive with the word "and."  Thus, venue may lie under

any of the scenarios outlined in the statute.  Consequently, venue properly rests in the Northern

District of Alabama if Alabama resides here.

The Federal Defendants further argue that, for venue purposes under § 1391(e)(3),

Alabama does not reside in the Northern District of Alabama, but only in the Middle District of

Alabama, which contains the state capital.  The Federal Defendants base their argument on cases

that are inapposite: *Tri-State Corp. v. State*, 128 So. 2d 505 (Ala. 1961), and *Flowers Indus., Inc.

v. FTC*, 835 F.2d 775 (11th Cir.1987).  In *Tri-State*, the Alabama Supreme Court held that "suits

involving <u>public officials</u> are properly maintained in the county of their official residence."  128

So. 2d at 509 (emphasis added).  However, Alabama, not its public officials, brought this suit.

Moreover, *Tri-State* involved venue under Alabama law, not 28 U.S.C. § 1391(e).

Furthermore, the Federal Defendants have not demonstrated why the rationale in the other

case they cite, *Flowers,* should carry over to a case in which the plaintiff is not a corporation, but

a state.  In *Flowers*, the Eleventh Circuit held that, under § 1391(e)(3), venue as to a corporate

<u>plaintiff</u> was properly restricted to its place of incorporation, despite language in § 1391(c)

permitting suits against corporate <u>defendants</u> "in any judicial district in which [the corporation] is

subject to personal jurisdiction at the time the action is commenced."  The Eleventh Circuit

decided that, as to corporations, venue should be construed more strictly under § 1391(e) than

under § 1391(c) because, under the well-settled law existing in 1962 when Congress enacted § 1391(e), for purposes of the general venue statutes, a corporation resided only in its state of incorporation.  *Flowers*, 835 F.2d at 777.  The court reasoned that, if Congress had intended § 1391(e)(4) to alter traditional venue law as to the residence of corporate plaintiffs, Congress would have clearly stated that intention within that section, as it had done with respect to corporate defendants by enacting 28 U.S.C. § 1391(c).  *Flowers*, 835 F.2d at 777.

The Federal Defendants argue that "[p]recisely the same logic [as in *Flowers*] applies to the official residence of the State of Alabama.  Because there is no evidence that Congress intended to alter traditional understanding regarding the residence of <u>government officials</u>, the traditional residence requirements continue to apply."  *Federal Defendants' Brief*, Doc. 277, p.11 (emphasis added.)  The Federal Defendants fail to grasp that the State of Alabama, not some government official, is the Plaintiff in this case.  Other than the inapposite *Tri-State* case, the Federal Defendants have provided no evidence that "traditional understanding" limited § 1391(e)(3) venue for state plaintiffs to the district containing the state capital.

The Federal Defendants' argument presents an issue of first impression.  Neither the Plaintiffs, who bear the burden of establishing the propriety of their chosen venue, nor the court could find any cases addressing where a state resides for venue purposes under 28 U.S.C. 1391(e).  *See Alabama's and Florida's Brief*, Doc.312, at 28 n.9.  The Plaintiffs argue that venue is proper because "Alabama, as a sovereign state, is ubiquitous within its borders."[32]  *See*

---

[32]Alabama has also argued that venue is proper because a large portion of the citizens on whose behalf Alabama is suing in its *parens patriae* capacity reside in the Northern District of Alabama.  *See Alabama's and Florida's Brief*, Doc. 312, at 26-29.  Throughout this lawsuit, beginning with its original complaint, *see* Doc. 1 at 1, Alabama has alleged that it is suing on its own behalf and on behalf of all its citizens in its *parens patriae* capacity.  Florida also claims to

*Alabama's and Florida's Brief*, Doc. 312, at 26.  Therefore, the Plaintiffs argue, Alabama

"resides" in every district it encompasses, and venue is appropriate in every district in Alabama.

Common sense suggests the Plaintiffs are correct.  Given the complete absence of

authority presented directly on this point, this court is not willing to create the new rule proposed

by the Federal Defendants that would, for no just or logical reason, limit a state containing more

than one federal judicial district to suing the Federal Government only in the district containing

the state capital, regardless of any other consideration relevant to the case or the parties'

convenience.  Indeed, the absence of authority may be precisely because common sense dictates

that a state resides throughout its sovereign borders and the idea has not previously been

challenged.  Therefore, the court holds that a state may bring suit under 28 U.S.C. § 1391(e)(3) in

any district within the state, and that venue is, therefore, proper as to Alabama's claims in this

case.

---

be suing as *parens patriae*.  *See* Doc 269, Ex. A, *Florida's Amended Complaint*, at ¶ 5.  For
reasons stated on the record at the hearing, the court has asked Alabama and Florida to clearly
demonstrate that they have standing to bring their claims against the Corps in their *parens
patriae* capacity.  *See Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923) ("While the state,
under some circumstances, may sue in [*parens patriae*] capacity for the protection of its citizens,
it is no part of its duty or power to enforce their rights in respect of their relations with the federal
government."); *Chiles v. Thornborough*, 865 F.2d 1197, 1208-09 (11th Cir. 1989) (questioning
*Mellon's* implications); *see also Connecticut v. Healthnet, Inc.*, 383 F.3d 1258, 1262 (11th Cir.
2004) ("When a state sues in *parens patriae* to enforce a federal statute, it must demonstrate that,
in enacting the statute, Congress clearly intended that the states be able to bring actions in that
capacity.").    The court will reserve until later ruling on whether the states have standing to
proceed as *parens patriae* in this case.  Because the court holds that venue is proper as to the
claims Alabama brings on its own behalf, the court need not at this stage address the propriety of
*parens patriae* and any venue questions, if any, as to those claims.

**C. The Propriety of Adding Allegedly Separate, Distinct, and New Causes of Action Under Rule 15**

The Georgia Defendants argue that Alabama's and Florida's motions to amend are actually motions to supplement, and that the motions to supplement must be denied because they seek to add new claims.  *See Georgia Defendants' Brief*, Doc. 281, at 31-33.  The motions technically <u>are</u> in large part motions to supplement, because motions to supplement by definition "set forth occurrences and or events that have happened since the date of the pleading sought to be supplemented."  *See* Fed. R. Civ. P. 15(d).  However, the slight differences between motions to supplement and motions to amend do not affect the standard of review in this case.  *See* 6A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1504 (2d ed. 1990) (explaining the standards of review for motions to supplement and motions to amend).

Citing cases decided by district courts outside this Circuit in 1939 and 1946,[33] the Georgia Defendants argue that permitting supplemental pleadings that allege new claims arising after the filing of the original complaint is the exception, not the rule.  While that may have been the law in the thirties and forties, in consulting the very materials cited by the Georgia Defendants, the court found that Georgia's position no longer represents the law.

The current trend has been to permit parties to "assert separate or additional claims or defenses arising after commencement [of the action], although courts typically require some relationship between the original and the later accruing material."  *See* 6A Charles Alan Wright

---

[33]The Georgia Defendants cite *Berssenbrugge v. Luce Mfg. Co.*, 30 F. Supp. 101, 102 (D. Mo. 1939), and *Bowles v. Senderowitz*, 65 F. Supp. 548, 552 (E.D. Pa. 1946).  The court notes that the rationale behind the principles for which the Georgia Defendants cite these cases proceeds from precedent and procedural rules in existence <u>before</u> the adoption of the Federal Rules of Civil Procedure in 1938.

& Arthur R. Miller, *Federal Practice and Procedure* § 1504, 1506 (2d ed. 1990); *see also* 3

James Wm. Moore et al., *Moore's Federal Practice* ¶ 15.30 (3rd ed. 2005).  Thus, to be

permitted under the modern framework, the allegations in the supplemental pleading need not

arise out of the same transaction or occurrence as the allegations in the original complaint.

Moore, *supra,* at ¶ 15.30.  The policy of judicial efficiency that "a party should be given every

opportunity to join all of his grievances against another party regardless of when they arose"

underlies the current, more permissive trend.  *See* Wright & Miller, *supra*, at § 1506; *see also*

*Franks v. Ross*, 313 F.3d 184, 198 (4th Cir. 2002) (noting that "[v]arious courts have concluded

that requiring a plaintiff to go through the needless formality and expense of instituting a new

action when events occurring after the original filing indicated he had a right to relief is

inconsistent with the philosophy of the federal rules").

  Supreme Court and Eleventh Circuit law illustrate courts' willingness to allow plaintiffs

to supplement complaints with new claims that arise after the filing of the action when those

claims are related to the claims in the original complaint.  *See, e.g., Griffin v. Sch. Bd. of Prince*

*County*, 377 U.S. 218, 226 (1964) (holding that an amended supplemental complaint to add

claims arising from continued violations of school desegregation orders presented a new and

different cause of action, but was "well within the basic aim of the rules to make pleadings a

means to achieve an orderly and fair administration of justice"); *Vesta Ins. Corp. v. Florida*, 141

F.3d 1427, 1432 n.9 (11th Cir. 1998) (suggesting that a plaintiff may file a supplemental

complaint stating a cause of action for economic harm suffered after the filing of a case); *Lussier*

*v. Dugger*, 904 F.2d 661, 670 (11th Cir. 1990) (noting that supplementing a complaint was an

appropriate means of adding a claim when statutory law created a new, retroactive cause of

action).  The court is convinced from its review of the relevant complaints and by the Plaintiffs'

arguments that the proposed supplemental claims are related to the claims in the earlier

complaints.  Thus, the court concludes that it may permit the Plaintiffs to supplement their

complaints with new claims that arose after their original claims.

In this particular case, the considerations of efficient administration of justice underlying

courts' permissiveness toward supplementation could not weigh more heavily in favor of

permitting supplementation with related claims.  As Judge Story noted in *Georgia v. Corps of

Engineers*, No. 2:01-CV-26-RWS (N.D. Ga.), the multiplicitous litigation over the Corps'

allocation of water in the ACF and ACT basin reservoirs has become "a poster-child for the

policies and considerations that encourage abatement of duplicative and parallel actions."  *See

Order on Reconsideration of Order Abating Georgia Case*, *Georgia v. Corps of Engineers*, No.

2:01-CV-26-RWS (N.D. Ga.) Doc. 156, at 8.  Requiring Alabama and Florida to file yet another

related lawsuit will merely further hamstring the heroic but heretofore frustrated efforts of three

district courts and two courts of appeals to see the controversy through to a conclusion on the

merits or by a settlement.

The Georgia Defendants further argue that the motions to amend are inappropriate

because they seek to revive a moot action and they could be the cause of a separate action or

proceeding.  *See Georgia Defendants' Brief*, Doc. 281, at 32.  For the reasons stated previously

in this opinion, the case has not become moot.  Further, although for much of the time this case

has been stayed, the underlying claims were never dormant.  Rather, during the stay, the parties

were attempting to negotiate a resolution to this case, violating the court's stay order, and

otherwise implicitly proving by their actions the continued vitality of the underlying claims.

49

For all the reasons stated above, the court will not deny the motions to amend or

supplement based on the Defendants' argument that Rule 15 precludes addition of new claims.

### D.  Allowing the Motions Would Not Unduly Prejudice Georgia and the ARC

### 1. Abatement of the Georgia Case

The Georgia Defendants argue that granting the motions to amend will unduly prejudice

them in pursuing <u>their</u> rights in *Georgia v. United States Army Corps of Eng'rs*, No. 2:01-CV-

26-RWS (N.D. Ga.), because Judge Story  has entered an order abating and administratively

closing that case pending final judgment in this one, and because allowing the amendments will

prolong this case. *See Order Abating Georgia Case, Georgia Case* Doc. 132;  *see also Order on*

*Reconsideration of Order Abating Georgia Case, Georgia Case* Doc. 156.  The Georgia

Defendants cite no legal authority to support this argument.

The Georgia Defendants argue that, while granting the motions to amend would "delay

resolution" of the litigation in the Northern District of Georgia, denying the motions "would not

prejudice Alabama or Florida" because they could "file the new claims in a separate lawsuit that

would not tie up the Georgia case indefinitely."  *See Georgia Defendants' Brief*, Doc. 281, at 40-

43.  As three United States District Courts and two United States Courts of Appeals have now

experienced first-hand, the multiplicity of lawsuits regarding the Corps' allocation of the waters

at issue in this case has done little more than "tie up" the litigation and prolong any settlement or

decision on the merits in any of these cases.  The Georgia Defendants' proposition that yet

another related lawsuit would promote more efficient resolution of any case on the merits is, at

best, utterly and preposterously meritless.

The rationale underlying Judge Story's abatement Order was avoidance of the

50

inefficiency, inconvenience, and comity complications accompanying the litigation of

"competing claims to water in the ACF basin" in multiple fora.  *See Order Abating Georgia*

*Case, Georgia Case* Doc. 132, at 16-18; *see also Order on Reconsideration of Order Abating*

*Georgia Case, Georgia Case* Doc. 156, at 8 (finding that "permitting this suit to proceed

concomitant with the Alabama action would waste the limited judicial resources of the litigants

and this court").  The Georgia Defendants suggestion that this court should require Alabama and

Florida to file yet another lawsuit regarding competing claims to water in the ACF basin

practically invites this court to circumvent Judge Story's abatement Order–an Order that is

already on appeal to the Eleventh Circuit–and, in so doing, illustrates the presence of the very

complications Judge Story sought to alleviate by his Order.

　　　　As this court has previously noted, "The dispute among the parties as to the allocation of

water from Lake Lanier is now centered in this court."  *See* Doc. 274 *Memorandum Opinion,* at

9; *Alabama v. United States Army Corps of Eng'rs*, 357 F. Supp. 2d 1313, 1320 (N.D. Ala.

2005).  The Northern District of Alabama may not be the Georgia Defendants' preference for a

forum, but, as discussed above, this court has jurisdiction to decide the case.  Therefore, to the

extent the Georgia Defendants want to press the claims they raised in the Georgia lawsuit in this

forum, those claims will be fairly heard so long as the court has jurisdiction to hear them.  Thus,

granting the motions to amend need not delay the resolution of the claims in the Georgia case.

## 2. Appearance of Unfairness

　　　　The Georgia Defendants argue that granting the motions to amend will unfairly prejudice

them because of an appearance of unfairness.  According to the Georgia Defendants, "many

entities within the State of Georgia with a direct interest in the D.C. Settlement Agreement and

with legally protectable interests have been reluctant to appear voluntarily to defend their interests before this [c]ourt," for fear of having the tri-state water dispute adjudicated in Alabama, where they have "no connection" with the Northern District of Alabama.  *See Georgia Defendants' Brief*, Doc. 281, at 42-43.  The Georgia Defendants maintain that "[t]his [c]ourt's order joining ARC as a party on the basis of a defensive special appearance[34] has significantly heightened the sense of caution in this regard."  *Id*.  Thus, the Georgia Defendants argue, "it now appears that this 'most controversial' issue, which is of vital importance to *all* of the residents of the ACF and ACT basins, will be decided by a court sitting in Alabama, with only limited representation for the Georgians affected."  *Id.*

As discussed above, this case currently lies outside the Supreme Court's exclusive original jurisdiction over controversies between two or more states.  Therefore, this case must be heard before a district court sitting <u>somewhere</u>.  Because of the tri-state impact of the Corps' water allocation decisions, any district court in the circuit adjudicating this dispute necessarily will be sitting in a state in which many interested entities do not reside.  Thus, "appearance of

---

[34]ARC did not intend to intervene, but intervened nonetheless by its own voluntary attempt to make a "special appearance" to contest this court's jurisdiction and the entry of the October 15, 2003 preliminary injunction.  *See* Doc. 196.  As discussed *supra*, Federal Rule of Civil Procedure 12 has generally done away with special appearances.  *See Harrison v. Prather*, 404 F.2d 267, 272 (5th Cir. 1968).  In addition, both the purpose of ARC's attempt to appear specially and its previous active involvement in the case far overran the limits of a special appearance.  *See September 30, 2004 Order on ARC's Motion for Permission to Appear Specially and for the Court to Lift the Preliminary Injunction*, Doc. 257.  Therefore, ARC's appearance was a general appearance, regardless of ARC's attempt to characterize it otherwise.  Accordingly, the court construed ARC's motion to appear specially as a motion to intervene and granted the motion.  *See September 30, 2004 Order on ARC's Motion for Permission to Appear Specially and for the Court to Lift the Preliminary Injunction*, Doc. 257.  However, the court will not force ARC to litigate its claims in the Northern District of Alabama.  If ARC does not wish to be a part of this lawsuit, it is free to make the appropriate motion.

unfairness" and "appearance of bias toward the home state" arguments like those the Georgia Defendants raise here could be invoked by <u>some</u> party to this dispute in <u>any</u> district court in Alabama, Georgia, or Florida, but those arguments would be as meritless elsewhere as here.  If any Georgians are worried about what will happen to water allocation if they are absent from this case, they are free to move to intervene, and they will be fairly heard.

The Georgia Defendants also argue that allowing the motions to amend will create the appearance of unfairness because the court is, at best, straining the bounds of its jurisdiction in this case, and, by granting the motions to amend, the court "will signal a willingness to adjudicate any and all disputes related to water allocation in the tri-state area."  *See Georgia Defendants' Brief*, Doc. 281, at 45-46.  However, the case does not, as the Georgia Defendants argue, "strain[] the boundaries of this court's subject matter jurisdiction," *see Georgia Defendants' Brief*, Doc. 281, at 46, but lies squarely within it.  Furthermore, this court is and has been zealous in examining challenges to its jurisdiction, and in independently considering whether jurisdiction exists.  It will not exercise jurisdiction over any dispute, even a dispute related to water allocation, if it has no jurisdiction to hear it.  Neither will it retreat from deciding any case over which it has jurisdiction when it has a duty to decide the case.  The Georgia Defendants' arguments on this point are simply misplaced.

**V. Conclusion**

The court has jurisdiction to consider the motions to amend.  Given the posture of this case, the lengthy stay, and changes in circumstances during the last fifteen years, justice requires allowing the parties to amend.  As discussed above, the court finds no reason such as undue prejudice or futility of the amendments, to deny the motions to amend.  Because leave to amend

should be freely given under Federal Rule of Civil Procedure 15, the court grants the motions.

However, the court orders Alabama and Florida to revise their amended complaints to make clear _exactly_ which agency actions they are challenging under _each_ claim, and to make other changes as necessary _only_ to clearly articulate the basis of this court's jurisdiction.

DONE and ORDERED this 10th day of August, 2005.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE