**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| **STATE OF ALABAMA, et al.,** ] | |
| ] | |
| **Plaintiffs,** ] | |
| ] | |
| **v.** ] | **CV-90-BE-01331-E** |
| ] | |
| **THE UNITED STATES ARMY** ] | |
| **CORPS OF ENGINEERS, et al.,** ] | |
| ] | |
| **Defendants.** ] | |

## MEMORANDUM OPINION

### I.  INTRODUCTION

This case is before the court on Florida's Renewed Motion for Temporary Restraining

Order to Protect Threatened and Endangered Mussels (doc. 496).  In this Motion, Florida

requests that the court order the U.S. Army Corps of Engineers ("the Corps") to maintain water

releases of 6,300 cubic feet per second ("cfs") from the Jim Woodruff Lock and Dam until

September 5, 2006, when the U.S. Fish and Wildlife Service issues its biological opinion.  For

the reasons set forth below, the court finds that Florida's Motion is due to be **DENIED** for failure

to show that the Corps' actions caused an unlawful "take" of federally protected species.

### II.  BACKGROUND

#### A.  The ACF System and the Jim Woodruff Lock and Dam.

The Chattahoochee River flows from the mountains of North Georgia across the state,

runs along the border between Alabama and Georgia, then joins with the Flint River at the

Florida-Georgia border to form the Apalachicola River.  From there, the river flows into the

Apalachicola Bay and the Gulf of Mexico.  Those three rivers, their tributaries, and the

associated drainage area form the Apalachicola-Chattahoochee-Flint ("ACF") Basin.

The Corps operates a number of federal reservoir projects within the ACF Basin, including Jim Woodruff Dam (Lake Seminole), George W. Andrews Dam and Lake, Walter F. George Dam and Lake, West Point Dam and Lake, and Buford Dam (Lake Sidney Lanier). Congress authorized these reservoirs to operate for multiple project purposes such as flood control, hydropower generation, and navigation.  Florida's Motion focuses on the alleged adverse impacts of the Corps' ACF Basin operations on the threatened and endangered species in the Apalachicola River downstream from the Jim Woodruff Lock and Dam ("Woodruff Dam").

**B.  The threatened and endangered ACF Species ("ACF species.")**

Four federally-listed threatened and endangered species are present in the Apalachicola River downstream from Woodruff Dam: the threatened Gulf sturgeon, the endangered fat threeridge mussel,[1] the threatened purple bankclimber mussel, and the threatened Chipola slabshell mussel.[2]  Florida contends that, since 1990, the Corps has operated the reservoirs upstream from Woodruff Dam in a manner that favors upstream recreational and non-authorized uses to the detriment of the downstream ACF species.  Specifically, Florida argues that the Corps retains water in upstream reservoirs and fails to satisfy the interim flow needs of the ACF species during periods of low flow conditions, such as those currently experienced.

Because of the current drought, discharges into the Apalachicola River from Woodruff dam, and the corresponding water levels in the Apalachicola basin, have steadily declined since June 1, 2006.  The mussels in the Apalachicola River are slow moving, and, while capable of moving to deeper water refuges for short distances, they generally cannot escape the adverse

---

[1]The only known habitat in the world for the fat threeridge mussel is the Apalachicola River.

[2]The Chipola slabshell mussel was only recently discovered in the areas affected by releases from the Jim Woodruff Dam.  *See* Carmody Decl., ¶ 7(a).

conditions they currently are experiencing in side channels and sloughs along the river.

Particularly dramatic flow reductions, as have been previously experienced in the Apalachicola

River, quickly sever the connection between the main river channel and occupied mussel habitats

outside the main channel before mussels can relocate, resulting in stranding and death due to

heat, predation, and dessication.  As a result, hundreds, if not thousands of dead and dying

mussels were observed in the Apalachicola River during field visits between June 12 and 14,

2006.  Among the dead and dying mussels were members of two species protected under the

ESA: the threatened purple bankclimber and the endangered fat threeridge.  These mussels are

the ACF species at issue for purposes of this memorandum opinion.

### C.  The Endangered Species Act ("ESA").

Florida contends that the Corps is violating the ESA by killing the threatened and

endangered mussels living in the Apalachicola River downstream of Woodruff Dam.  The ESA

protects threatened and endangered species in two ways relevant to this case.  First, § 7 requires

federal agencies to consult with the U.S. Fish and Wildlife Service ("FWS") to ensure that their

actions do not "jeopardize the continued existence" of any protected species or result in the

"destruction or adverse modification" of "critical habitat."[3]  *See* 16 U.S.C. § 1536(a)(2) (2005).

Under this section, an agency proposing an action must first determine whether the action "may

affect" listed species.  50 C.F.R. § 402.11 (2005).  If the agency determines that its actions "may

affect" a protected species or its habitat, then the agency must generally enter into consultation

with FWS.  *See* 16 U.S.C. § 1536(a)(2) (2005).

---

[3]A "critical habitat" is a specific geographic area occupied by a threatened or endangered
species that is essential to the conservation of the species and may require special management
considerations or protection.  *See* 16 U.S.C. § 1532(5)(A).  The Apalachicola River and its
tributaries are designated as critical habitat for the Gulf sturgeon.  *See* 68 Fed. Reg. 13,370
(March 19, 2003).

The ESA regulations provide for two forms of consultation – informal and formal. Informal consultation is "an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency...designed to assist the Federal agency in determining whether formal consultation is required." *Id*. at § 402.13(a) (2005).  If, on the other hand, the agency determines during informal consultation that its action is likely to adversely affect protected species or critical habitat, then the agency *must* request initiation of formal consultation with the appropriate service. *See Id*. at 402.14(a) & (b) (2005).

By regulation, formal consultation concludes "within 90 days after its initiation" unless extended by mutual consent of FWS and the action agency. *Id*. at § 402.14(e) (2005).  FWS then has 45 days from the completion of formal consultation to deliver a "biological opinion" to the action agency. *Id*.  The regulations thus provide FWS with no less than 135 days from the initiation of formal consultation to deliver a biological opinion.

The biological opinion provides FWS' assessment as to whether the action is "likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat." *Id*. at § 402.14(h)(3).  In the event the biological opinion includes a "jeopardy opinion," the opinion must also include "reasonable and prudent alternatives," if any, to mitigate the effects of agency action. *Id*.

The second method relevant to this case by which the ESA protects threatened and endangered species is through § 9.  Section 9 prohibits the "take" of protected species by federal agencies or private individuals. *See* 16 U.S.C. § 1538(a)(1)(B).  The ESA defines "take" to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." 16 U.S.C. § 1532(19) (2005).  The term "harass" is further defined as

an intentional or negligent act which creates the likelihood of injury to wildlife by

annoying it to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to breeding, feeding, or sheltering.

50 C.F.R. § 17.3.  The term "harm" means

[a]n act which actually kills or injures wildlife.  Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavior patterns, including breeding, feeding or sheltering.

*Id*.

Florida argues that the Corps can kill threatened and endangered mussels only pursuant to an Incidental Take Statement.  An Incidental Take Statement can be obtained through the successful completion of formal consultation.  *See* 16 U.S.C. § 1536(b)(4) and (o); 50 C.F.R. § 402.14(I).  The Statement permits some "incidental take" of protected species that "result[s] from, but are not the purpose of, carrying out an otherwise lawful activity conducted by the Federal agency."  50 C.F.R. § 402.02; *see also* 16 U.S.C. § 1536(b)(4).  The Statement specifies the impact the agency action will have on the species, sets forth "reasonable and prudent measures" to alleviate the anticipated adverse impact, and establishes "terms and conditions" necessary for the implementation of the measures.  16 U.S.C. § 1536(b)(4); *see also* 50 C.F.R. § 402.14(i)(ii).  Pursuant to the ESA, a take that complies with an Incidental Take Statement is a lawful take.  *See* 16 U.S.C. § 1536(o)(2).   However, because the Corps has not completed formal consultation with FWS and does not possess an Incidental Take Statement, Florida contends that the Corps' river operations violate the ESA by causing a prohibited take and warrant immediate injunctive relief.  Florida requests that the court order the Corps to maintain releases of 6,300 cubic feet per second ("cfs") from Woodruff Dam until September 5, 2006 – the date that the

biological opinion from FWS is scheduled to be issued.[4]

### D. ESA consultation and the Interim Operations Plan.

For some undefined period of time, the Corps and FWS have been engaged in informal discussions over the operation of the ACF basin reservoirs. Pursuant to its obligations under § 7 of the ESA, the Corps initiated formal consultation with FWS on March 7, 2006. FWS is scheduled to complete its consultation and issue a biological opinion on September 5, 2006. Until the biological opinion is issued, the Corps intends to implement – and, in fact, has been following – an Interim Operations Plan ("IOP"). The IOP incorporates a sliding scale water release schedule that is triggered by basin inflow to the ACF System. For the time period relevant to this Motion, the IOP provides for releases from Woodruff Dam in the following quantities:

| Basin Inflow (cfs) | Releases from Woodruff Dam (cfs) |
|---|---|
| 37,400 or greater | at least 37,400 |
| 8,000 to 37,399 | greater than or equal to 70% to 90% of basin inflow; but no less than 8,000 |
| less than 8,000 | at least basin inflow; but no less than 5,000 |

Further, the plan establishes down ramping rates[5] that correspond to the releases from Woodruff Dam. These rates attempt to limit the stranding of mussels that have limited mobility. The schedule for maximum down ramping rates is as follows:

| Release Range | Maximum Fall Rate (feet/day) measured at Chattahoochee gauge |
|---|---|
| Exceeds 18,000 cfs | 0.5 to 1.0 ft/day |
| 8,000 to 17,999 cfs | 0.25 to 0.5 ft/day |
| less than 8,000 cfs | 0.25 ft/day or less |

---

[4]The biological opinion was originally due on July 21, 2006. However, the Corps granted FWS' request for an extension on June 28, 2006. Pursuant to that extension, the biological opinion is now due on September 5, 2006. *See* doc. 492 and attachments.

[5]Down ramping rates are also referred to as fall rates.

**E.  Procedural background.**

On January 31, 2006, Florida filed a Motion for Preliminary Injunction on its ESA claim, primarily to protect the Gulf Sturgeon.  In its Motion, Florida sought injunctive relief to compel the Corps to comply with the ESA when operating reservoirs in the ACF Basin.  In response to Florida's Motion, the Corps initiated formal consultation with FWS pursuant to § 7 of the ESA. In its consultation request, the Corps acknowledged that "impacts to protected mussels may potentially occur whenever flows are less than 8,000 cfs."[6]

After allowing the parties to fully brief the issues, and pursuant to the hearing conducted on April 14, 2006, the court denied Florida's Motion because Florida did not show a substantial likelihood of success on the merits or an irreparable injury.  However, the court expressly stated that if the Corps took future action that resulted in an irreparable injury under the ESA, Florida was permitted to again seek injunctive relief.

Thereafter, on June 21, 2006, Florida filed a Motion for Temporary Restraining Order to Protect Threatened and Endangered Mussels.  In this Motion, Florida argued that the IOP, as implemented, resulted in an unlawful take of the ACF species, specifically the endangered and threatened mussels.  Florida supported its Motion with evidence that the Corps' implementation of the IOP and allowing  precipitous drops in flows stranded hundred of mussels and resulted in the deaths of numerous protected mussels.  Accordingly, on June 22, 2006, the court granted Florida's Motion and ordered the Corps to deviate from the IOP and maintain releases of 8,000 cfs from Woodruff Dam.  The court then set the case for a hearing the next day.

Pursuant to the June 23, 2006 hearing, and a tentative agreement reached by the parties at the court's urging, the court revised its temporary restraining order and lowered the required

---

[6]*See* doc. 416, Ex. 1, Consultation Letter dated March 7, 2006, p. 19

release from Woodruff to 7,000 cfs.  Over the next seven days, as the parties negotiated a

settlement, the court lowered the releases at Woodruff Dam from 7,000 cfs to 6,000 cfs.

Ultimately, on June 30, 2006, the parties entered into an Interim Settlement Agreement.  This

historic Agreement created an environmental storage pool in the ACF System that Florida could

access to ensure that flows from Woodruff were maintained at an average of 6,000 cfs.  The court

approved the Interim Settlement Agreement and vacated its temporary restraining order.

Currently, the ACF Basin is experiencing a severe drought, with basin inflows recently

measured below 2,500 cfs.  Moreover, the Interim Settlement Agreement expired on July 24,

2006.[7]  Accordingly, the Corps reverted back to the IOP and gradually ramped down releases

from Woodruff Dam to 5,000 cfs.  As a result, Florida filed this Motion for Temporary

Restraining Order, requesting a minimum flow of 6,300 cfs in the Apalachicola River until the

Corps and FWS complete their formal consultation.  The court permitted the parties to submit

briefs and evidence in support of their respective positions, and heard oral arguments on July 24,

2006.  A portion of the evidence submitted for purposes of this Motion was the same evidence

submitted during Florida's previous Motion for Temporary Restraining Order.  However, a

substantial quantity of new evidence was introduced for purposes of this Motion.  The  most

important new evidence came from  the declaration and oral testimony of Ms. Gail Carmody, the

local Field Supervisor for the FWS.

### III.  JURISDICTION

Before reaching the merits of Florida's Motion for TRO, the court must address a

jurisdictional issue – whether Florida complied with the ESA's 60-day citizen suit notice

---

[7]This date was the original date by which FWS was to have completed its formal
consultation with the Corps and issued its biological opinion pursuant to § 7 of the ESA.

requirement.  Whenever a question arises concerning the court's jurisdiction, the court is obliged to fully examine the issue.  *See Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001).

The Corps, Georgia, the ARC, and Alabama Power contend that Florida failed to satisfy the ESA's sixty-day notice requirement, and, accordingly, that this court lacks jurisdiction to hear this Motion.  These parties concede that Florida submitted a notice letter on November 5, 2004, but argue that this notice does not address the same issues raised by Florida's Motion for TRO – namely, that the IOP violates the ESA's prohibition on the unlawful take of protected species.  More specifically, these parties state that the November 5, 2004 letter was provided *before* the IOP was established and *before* the discovery of protected mussels in Swift Slough.  Consequently, the Corps, Georgia, the ARC, and Alabama Power contend that the letter cannot, by definition, have put the Corps or the U.S. Fish and Wildlife Service on notice of Florida's ESA allegations.

The ESA is the "most comprehensive legislation for the preservation of endangered species ever enacted by any nation."  *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978).  The United States Supreme Court noted that "the plain intent of Congress in enacting this statute was to halt and reverse the trend towards species extinction, *whatever the cost*."  *Id.* at 184, 98 S.Ct. 2279 (emphasis added).  The ESA provides for a citizen suit provision "that allows private citizens to sue the United States and its agencies for substantive violation of the ESA."  *San Carlos Apache Tribe v. United States of America*, 272 F. Supp. 2d 860, 871 (D. Az. 2003).  However, under the express terms of the ESA, no citizen suit may be commenced "prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation."  16 U.S.C. § 1540(g)(2)(A)(I) (2002).  The sixty-day notice period is designed to afford the agency an

opportunity to correct its actions, and to give the parties an opportunity to resolve the suit without

litigation.  *See San Carlos Apache Tribe*, 272 F. Supp. 2d at 871; *citing Southwest Center for

Biological Diversity v. United States Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998);

*Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1072 (9th Cir. 1996).  The sixty-day notice

requirement is jurisdictional.  *Id*.

The United States District Court for the District of Columbia considered a similar issue in

*American Rivers v. U.S. Army Corps of Engineers*, 271 F. Supp. 2d 230 (D. D.C. 2003).  In that

case, environmental groups sought to enjoin the Corps' operation of certain dams and reservoirs

pursuant to the ESA.  *Id*. at 246.  Before granting the plaintiffs' motion for preliminary

injunction, the court considered whether the plaintiffs' claims were barred under the ESA's sixty-

day notice requirement.  *Id*.  The court found that a notice letter sent six-and-a-half months prior

to the plaintiffs' motion for preliminary injunction satisfied the ESA's notice provision, even

though the plaintiffs asserted additional ESA claims regarding (1) a FWS biological opinion, and

(2) a Corps of Engineers reservoir operation plan – neither of which existed until *after* the notice

letter had been sent.  *Id*. at 244-46.  The court determined that the notice letter "put the Federal

Defendants on adequate notice that Plaintiffs would seek, through litigation, to make them

comply with the ESA requirements in the management of the Missouri River Basin during the

2003 water year."  *Id*. at 246; *see also Loggerhead Turtle v. County Council of Volusia* County,

148 F.3d 1231, 1255-56 (11th Cir. 1998) (finding that the notice letter as a whole provided

sufficient notice of an ESA violation even when certain protected species were not mentioned in

the letter); *Sierra Club v. Froehlke*, 534 F.2d 1289, 1302-03 (8th Cir. 1976) (denying defendants'

motion to dismiss when an ESA claim was asserted ten days prior to the trial setting because the

evidence relevant to the ESA claim was fully developed and "[t]o allow defendants to further

prepare...would produce no added evidence which would help this Court in its decision"); *San Carlos Apache Tribe v. United States*, 272 F. Supp. 2d 860, 872 (D. Az. 2003) (finding that, pursuant to the ESA's sixty-day requirement, a letter dated July 3, 1997 provided adequate notice of the plaintiffs' intent to sue for conditions existing on a lake in 1999 because "[i]t was the ongoing operation of the dam and the repeated drawdowns of the Lake that Plaintiffs were challenging");

In this case, Florida's notice letter dated November 5, 2004 states:

[T]he Corps' practice of 1) *withholding water upstream* to support non-native reservoir species, and 2) *manipulating reservoir releases* needed for navigation in a manner that sharply depletes Apalachicola River flows in the spring has and will result in *unlawful takings* of Gulf sturgeon and the *mussel species. Such actions violate Section 9 of the ESA*, 7 U.S.C. § 1538.

\*        \*        \*

Because the Corps has indicated no intention of changing its past practices, it is reasonably likely that additional take of Gulf sturgeon and the mussels will occur in the future. Because the Corps has not completed Section 7 consultation, the Corps lacks an incidental take statement that might otherwise authorize such a take. Accordingly, the Corps' operations have violated and will continue to violate Section 9 of the ESA.[8]

The court finds that the express terms of this letter put the Corps on notice that Florida was challenging the *ongoing* operation of the reservoirs in the ACF Basin. The court also notes that Florida's third Amended Complaint filed September 7, 2005 and the original Motion for Temporary Restraining Order filed January 31, 2006 referenced the Corps' river operations and the alleged ESA violations. Further, the parties have been negotiating over the ongoing operation of these reservoirs since 1990. Thus, the Corps cannot claim that it did not have notice of

---

[8]*See* Ct.'s Ex. 1, Hearing, July 24, 2006, pp. 2, 14-15. Because the court could not locate the Notice Letter in the hundreds of documents previously submitted, it requested a copy of it at the hearing to be made a part of the record.

Florida's intent to seek compliance with the ESA.  *See American Rivers*, 271 F. Supp. 2d at 246.

Because the Corps' operation of the ACF reservoirs is at issue for purposes of this Motion, the

court concludes that Florida complied with the sixty-day notice requirement to the ESA's citizen

suit provision.  Accordingly, this court has jurisdiction to hear this Motion.

### IV.  STANDARD OF REVIEW

The court must next determine what standard of review applies to a Motion for

Temporary Restraining Order when the underlying claim is a violation of the ESA.  The Corps

contends that the traditional four-prong test should govern this court's analysis.  *See Alabama v.*

*U.S. Corps of Engineers*, 424 F.3d 1117, 1128 (11th Cir. 2005).  In contrast, Florida argues that a

truncated standard of review applies to ESA claims.  *See Loggerhead Turtle v. County Council of*

*Volusia County*, 896 F. Supp. 1170, 1178 (M.D. Fla. 1995).  The court has, during previous

hearings, touched on this question, but notes that the Eleventh Circuit has not definitively ruled

on this issue.

Under the traditional test for injunctive relief urged by the Corps, to prevail on a motion

for injunctive relief in the Eleventh Circuit, a movant must show (1) a substantial likelihood of

success on the merits; (2) that irreparable injury will be suffered if the relief is not granted; (3)

that the threatened injury outweighs the harm the relief would inflict on the non-movant; and (4)

that entry of the relief would serve the public interest.  *See Alabama v. U.S. Corps of Engineers*,

424 F.3d at 1128.

However, Florida contends that a truncated standard of review applies to cases involving

a substantial violation of the ESA.  Under this standard, Florida argues that it essentially need

only demonstrate threatened harm to a protected species to prevail on its Motion.  To support this

contention, Florida offers *Loggerhead Turtle v. County Council of Volusia County*, 896 F. Supp.

1170, 1178 (M.D. Fla. 1995), where the District Court for the Middle District of Florida

explained:

> the broad language of the [ESA] and the pronouncements of the Supreme Court
> persuade this Court that, in considering the entry of an injunction under the
> [ESA]: (1) the Court does not have the "traditional equitable discretion" to
> balance the parties' interests, (2) any threatened harm is *per se* irreparable harm,
> and (3) the public interest always favors the imposition of an injunction under the
> Act.

896 F. Supp. at 1178, *citing TVA v. Hill*, 437 U.S. 153, 174 (1978).

The court notes that the adoption of a truncated test for ESA claims stems from the

Supreme Court's decision in *TVA v. Hill*.  The Court found that, pursuant to the ESA, "Congress

has spoken in the plainest of words, making it abundantly clear that the balance has been struck

in favor of affording endangered species the highest of priorities...." *TVA v. Hill*, 437 U.S. 153,

194 (1978).  In accordance with this finding, various courts have determined that the ESA

removes a federal court's discretion in determining the balance of hardships between the parties.

*See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)

(comparing the ESA with the Clean Water Act and stating that the *TVA* decision was based on an

understanding that under the ESA, "Congress had foreclosed the exercise of the usual discretion

possessed by a court of equity"); *Nat'l Wildlife Fed'n v. Burlington N. R.R., Inc.*, 23 F.3d 1508,

1511 (9th Cir. 1994) ("[i]n cases involving the ESA, Congress removed from the courts their

traditional discretion in injunction proceedings of balancing the parties' competing interests");

*Sierra Club v. Marsh*, 816 F.2d 1376, 1383 (9th Cir. 1987) (citing *TVA* and stating that "Congress

had explicitly foreclosed the exercise of traditional equitable discretion by courts faced with a

violation of [the ESA]"); *Sierra Club v. Norton*, 207 F. Supp. 2d 1310, 1340 (S.D. Ala. 2002)

(noting that with respect to NEPA violations, "the court need not rely upon the Congressional

pre-balancing of equities *as found in the ESA* to find issuance of a preliminary injunction proper") (emphasis added); *Greenpeace v. Nat'l Marine Fisheries Svc.*, 106 F. Supp. 2d 1066, 1072 (W.D. Wash. 2000) ("[u]nder the ESA, the balance of hardships has already been struck in favor of the endangered species").

The court agrees that Congress has spoken clearly in that "[t]he plain intent of Congress in enacting [the ESA] was to halt and reverse the trend towards species extinction, *whatever the cost.*" *TVA v. Hill*, 437 U.S. 153, 184 (1978) (emphasis added).  However, the court is also cognizant of the fact that the Eleventh Circuit has not expressly determined what standard of review applies to cases such as this.[9]  Accordingly, out of an abundance of caution, the court holds that the proper standard in this case is the traditional four-prong test, but with the recognition of the balancing of equities and the determination of public good already made by Congress in enacting the ESA.

## V.  DISCUSSION

Having determined that the traditional 4-prong test applies, with special deference to be given to Congressional balancing of equities in favor of an endangered species, the court must apply that standard to determine whether Florida's request for an injunction should be granted. Georgia and ARC raise some procedural challenges to Florida's motion.[10]  The court need not

---

[9]The Eleventh Circuit has noted, however, that "protecting troubled wildlife is a serious business," that the ESA is a "powerful and substantially unequivocal statute," and that "[t]he language, history, and structure of the [ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities.") *See Loggerhead Turtle v. County Council of Volusia County*, 148 F.3d 1231, 1246 (11th Cir. 1998) citing *TVA v. Hill*, 437 U.S. 153, 174 (1978), and *Strahan v. Linnon*, 967 F. Supp. 581, 618 (D. Mass. 1997).

[10]Georgia and the ARC contend that Florida's Motion is improper because it does not seek to maintain the status quo and it does not seek relief pending litigation on the merits of any claim.

consider those challenges in light of the determination that Florida has not met its burden to establish that the Corps' IOP  is responsible for the alleged take of the protected mussels and that the take will result in irreparable harm before the FWS issues its biological opinion on September 5, 2006.

**A.  Likelihood of success on the merits.**

Florida bears the burden of establishing that it has a substantial likelihood of success on the merits of its claim.  In this case, Florida must establish that the IOP under which the Corps currently operates  is causing a prohibited take of the endangered mussels in the Apalachicola River basin in violation of § 9 of the ESA.  No one disputes that  protected mussels are dying by the hundreds, that more will die at 5,000 cfs, and that their habitat is being modified by the decreased flows so that they are facing death, harm and harassment. Thus, the court finds that a take has occurred as that term is defined by 16 U.S.C. § 1532 (19) and 50 C.F.R. § 17.3.  If that take is caused by a "person," that take is prohibited by 18 U.S.C. § 1538(a)(1)(B).[11]  Florida, however, has not demonstrated "but for" causation between the Corps' actions in implementing the IOP and the take of these mussels.  *See Babbitt v. Sweet Home Chapter of Communities for a Great Or.*, 515 U.S. 687, 700 n13 (1995) ("but for" causation required for a takings claim); *Cold Mountain v. Garber*, 375 F.3d 884, 890 (9th Cir. 2004) (affirming summary judgment because plaintiffs failed to establish a causal link between the challenged activity and the alleged

---

[11]With certain exceptions, "it is unlawful for any person subject to the jurisdiction of the United States to...take any such species within the United States or the territorial sea of the United States...."  *See* 16 U.S.C. § 1538(a)(1)(B).  A person is "an individual, corporation, partnership, trust, association, or any other private entity; or any officer employee, agent, department, or instrumentality of the Federal Government, of any State municipality, or political subdivision of a State, or of any foreign government; any State, municipality, or political subdivision of a State, or any other entity subject to the jurisdiction of the United States."  16 U.S.C. § 1532(13).

'taking'); *Loggerhead Turtle v. County Council of Volusia County, Fla.,* 92 F. Supp. 2d 1296, 1306-07 (M.D. Fla. 2000) (plaintiff failed to establish that the challenged ordinance caused the takings).

Florida cites the Declaration of Gail Carmody, filed by the Corps on July 14, 2006 as showing that the IOP results in a take.[12]  Ms. Carmody is the Field Supervisor for the Northwest Florida Ecological Services Field Office of the Southeastern Region of the U.S. Fish and Wildlife Services, an agency of the Department of Interior.  She bears responsibility for administration of § 7 of the ESA, including consultation with federal agencies, such as the Corps, when their actions might affect endangered species; issuance of biological opinions concerning the effect of those activities on the species; and devising reasonable and prudent alternatives to avoid the likelihood of jeopardizing the continued existence of the species.

The FWS has been engaged in informal then formal consultation with the Corps concerning the IOP and its possible effects on the protected species within the ACF basin.  At the request of the court, the Corps obtained Ms. Carmody's declaration containing the preliminary conclusions of the FWS, and Ms. Carmody appeared at the hearing on the TRO so the court could benefit from her expertise.

All parties to this dispute point to portions of Ms. Carmody's declaration to support whatever position they assert. Although the entire report provides important historical background and current analysis of the plight of the protected mussels, the most significant statement is paragraph 6(g), where Ms. Carmody states: "[b]ased on the preliminary conclusions listed above, we anticipate that the Service's Biological Opinion will find that the IOP is likely to result in incidental take of the listed mussels, but is not likely to jeopardize their continued

---

[12]*See* doc. 494, Ex. 1, Carmody Decl.

existence."[13]  Florida relies on the first part – that the IOP is likely to result in incidental take – to support its argument that the Corps has and is continuing to violate § 9's prohibition of any take. Not surprisingly, the Corps cites the second part – that the IOP is not likely to jeopardize the continued existence of the mussels – as support of its position of no take, or alternatively, that it will not cause irreparable harm.

At the hearing, Ms. Carmody explained FWS's position. She confirmed that adverse effects caused by the IOP are likely to result in a take, but that the combination of all the adverse effects will not likely jeopardize the future existence of the species as a whole. However, she did clarify that when she refers to a "take" she is using that term within the context of § 7 and not § 9.

The court recognizes that the standard for a prohibited take under § 9 differs from the standard that the FWS must apply in evaluating an incidental take pursuant to § 7.  Section 9 prohibits the "take" of any endangered species.  *See* 16 U.S.C. § 1538 (a)(1)(B).  Section 7 requires a federal agency, such as the Corps, to insure that its action "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species...."  16 U.S.C. § 1536(a)(2) (2005). This section further requires consultation with the FWS[14] and provides for the granting of an exemption for certain activities that jeopardize endangered or threatened species or adversely alter the habitat of these species.  *Id.*; *see also* 16 U.S.C. § 1536(h).

In *Loggerhead Turtle v. County Council of Volusia County, Fla.*, the court noted:

---

[13]*Id.*, ¶ 6(g).

[14]The statute actually requires consultation with the Secretary of the Interior. The FWS is the agency of the Department of the Interior that is charged with administering § 7 and overseeing the protection of species under the ESA.

> It is irrelevant for the purposes of the Act whether the "taking" at issue involves a critical habitat or not. Moreover, the Act does not distinguish between a taking of the whole species or only one member of the species. *Any taking and every taking* -- even of a single individual of the protected species -- is prohibited by the Act. *See* 16 U.S.C. § 1538. Hence the future threat of a even [sic] single taking is sufficient to invoke the authority of the Act. *See Swan View Coalition, Inc. v. Turner*, 824 F. Supp. 923, 938 (D. Mont. 1992) (threatened extinction is not necessary for a finding of harm under the Endangered Species Act).

896 F. Supp. 1170, 1180 (M.D. Fla. 1995)(emphasis in original).  Florida argues that this court should follow the declaration of the court in *Loggerhead Turtle* and hold that the loss of even one mussel constitutes an impermissible take in this case.  The court need not reach this disputed point because, even assuming the loss of any mussels qualifies as a take, Florida has not established the necessary causal link between the actions of the Corps and the harm to the mussels.  As the Corps asserts, not every take violates the ESA.  Section 9 prohibits takes by "any person."  16 U.S.C. § 1538(a)(1)(B).  Takes that result from acts of nature do not fall within the prohibition of § 9 and cannot be blamed on the Corps. *See* 16 U.S.C. § 1532(19).

_____ Florida urges this court to find that the Corps' choice as to the amount of water to retain upstream in storage verses the amount to release downstream to support protected mussels violates the anti-taking provision of the ESA.  The court is not convinced that the predicament faced by these protected mussels rests at the feet of the Corps.  Instead, the weight of evidence points to other causes for the exposure of the mussels and harm to their habitat.  No one disputes that the ACF basin suffers from severe drought conditions.  Evidence from FWS indicates that drought conditions have become more severe than droughts were in the years prior to the constructing of dams on these affected rivers.  While the presence of these dams may have contributed in some ways to the effects of this year's drought, Florida offered no evidence on this point. Because of decreased rainfall and increased evaporation, the amount of water available in

the ACF basin has fallen sharply.  The court cannot hold the Corps responsible for the absence of rain.

Another factor that affects the habitat, and consequently, the well being of these protected mussels is the flow –or lack thereof – of water into the Swift Slough.  According to FWS, this particular slough supports some of the highest density of fat threeridge mussel beds known.[15] The amount of water requested by Florida is designed to provide a modest inflow into this slough that is threatened with being disconnected from its source of water.  Again, the weight of evidence points to factors other than the IOP that affect the availability of water flow into this slough. Not only has the drought alone affected the availability of water into the slough, the accessability into the slough has been greatly hindered by the build up of sedimentation at the entrance to the slough.[16]

FWS  noted that sedimentation is a factor that affects mussel mortality rates.  Ms. Carmody testified that changes in the channel, including sedimentation, cause the mussels to be exposed at higher levels than in the previous drought years.  According to Ms. Carmody, sedimentation not only affects access to the slough, it also brings the bottom up, so that as the water levels decrease, the mussels are exposed earlier in the drought process than they may have been in prior periods of  drought.  She further stated that nothing about the IOP is causing the increase in sedimentation in those areas.

Florida argues, however, that the Corps should do more to protect these mussels than the protection that nature provides.  The court can find no controlling authority that requires the

---

[15]See doc. 494, Ex. 1, Carmody Decl., ¶ 5(f).

[16]See doc. 499, Ex. B with attachments, U.S. Geological Survey letter dated July 13, 2006.

Corps to do more than what it currently is doing.  In consultation with FWS and in an effort to provide some protection to the endangered mussels, the Corps developed the IOP in anticipation of the drought conditions.  The IOP provides that the Corps will release water commensurate with the amount of inflow into the basin, but that if the inflow falls *below* 5,000 cfs, the Corps will maintain a *minimum* flow of 5,000 cfs.  The Corps, thus, has already taken affirmative action to provide *more* protection to the mussels than the natural flow of unhindered water would provide the mussels during this drought period.  The Corps reached the 5,000 minimum cfs in consultation with FWS.  FWS – not the court – has the expertise and has been charged with overseeing the protection of these endangered mussels and working with the Corps to establish mitigatory measures to protect these species.   In fact, as Ms. Carmody testified, FWS currently recommends implementation of the IOP and is working with the Corps to minimize adverse effects on the listed mussels with the reduced water levels.[17]

Given these facts, and the lack of evidence to establish a causal connection between any take of the mussels and actions by the Corps, Florida fails to meet its burden of establishing a substantial likelihood of success on the merits.  _____

**B.  Irreparable Harm.**

Although the court does not need to discuss the remaining prongs of the injunction standard, having concluded that Florida's proof fails on to meet the first requirement, for completeness sake, the court will briefly address the factors touching on those issues.

Even if the Corps' action in implementing the IOP somehow resulted in an impermissible take, Florida would still be required to prove irreparable harm.  Florida again cites *Loggerhead Turtle* for the proposition that every harm to an endangered species is presumed to be irreparable.

---

[17]*See* doc. 494, Ex. 1, Carmody Decl., p. 10.

*See* 966 F. Supp. at 1178.

A close reading of *TVA*, the case upon which the decision in *Loggerhead Turtle* rests, indicates that the court must consider the effect of the alleged take on the species as a whole.  In *TVA*, the Supreme Court stated "it is correct, of course, that a federal judge sitting as a chancellor *is not mechanically obligated to grant an injunction for every violation of law*."  *TVA,* 437 U.S. at 193 (emphasis added).  The Court recognized, however, that in the case before it the building of the dam  at issue would have caused eradication of an entire endangered species if not enjoined; therefore, the only remedy that could prevent that outcome was a permanent injunction halting the construction.  *Id*. at 194-95.

 Other courts have held that more than the take of a  single animal is required to demonstrate irreparable harm.  For example, the First Circuit upheld a district court's finding that "assertions concerning irreparable harm stemming from the 'death of even a single member of an endangered species' were insufficient to justify granting injunctive relief." *Water Keeper Alliance v. United States Dept. of Defense*, 271 F.3d 21, 34 (1st Cir. 2001).  Instead, the court found that the plaintiff had failed to show irreparable harm without "a more concrete showing of probable deaths during the interim period and of how these deaths might impact the species." *Id.*

The Circuit Court for the  District of Columbia rejected a similar argument and  refused to accept the "extreme contention that the loss of only one bird is sufficient injury to warrant a preliminary injunction; rather, a proponent of such an injunction must raise a substantial possibility that the harvest of excessive numbers of these waterfowl will irretrievably damage the species." *Fund for Animals v. Frizzel,* 530 F.2d 982, 987 (D.C. Cir. 1975).

This court need not determine whether irreparable harm requires more than a showing of potential harm to some members of the protected species.  Granted, Florida contends that a

significant percentage of the mussels, perhaps more than half of the population, face *exposure* at the 5,000 cfs level.  Exposure does not automatically result in death.[18]  Florida's proof also does not address the effect of such a reduced flow on the long term viability of the species, or why a flow of 6,300 cfs would make an appreciable difference.  While the court certainly acknowledges that harm that threatens the very existence of an endangered species constitutes irreparable harm, the court is not convinced that Florida has met its burden of proof in this instance.

The most compelling evidence before the court comes from FWS.  In its preliminary opinion, FWS does not anticipate that the IOP will jeopardize the continued existence of the protected mussels.[19]  Ms. Carmody further testified that based on the preliminary data and on the understanding of the demographics of the mussel population, FWS does not anticipate that mussel population will be jeopardized. Further, according to Ms. Carmody's testimony, FWS recommends implementation of the IOP with its minimum flow of 5,000 cfs.  In reaching its final conclusions, FWS will consider the best scientific and commercial evidence available, including various modeling of maximum sustainable minimum flows, and will discuss with the Corps ways to minimize harm to protected mussels at flows below 8,000 cfs.  As noted by Ms. Carmody, not all instantaneous steps to mitigate the effects of the drought on the mussels would be sustainable over time.  Further, FWS has recently taken additional steps to protect these mussels by initiating the process for designation of critical habitat for these mussels.  *See* 71 Fed. Reg. 32,740 (June 6, 2006).

As the agency charged with the primary responsibility for overseeing the protection of

---

[18]*See Id*., p. 7 ("mussel mortality rates due to exposure during low-flow events are likely highly variable, depending on water and ambient temperature, duration of exposure, and other factors such as sedimentation.")

[19]*See Id*. p.10.

these endangered mussels, FWS' preliminary conclusions warrant deference by the court.  FWS –

not the court – is in the best position to determine the appropriate steps to protect these mussels

over the long run.  Although the release of more water from the upstream reservoirs would

benefit the mussels in the short term, the long term effect of drawing down water could be more

deleterious to the actual survival of the mussel species; using the reserves now would mean that

less water will be available in the future to combat the effects of this drought should it continue

as anticipated.

_____Although the court need not reach this issue, the court questions whether Florida has met

its burden.

### C.  Balancing of equities.

Assuming that the traditional standard applies to injunctions under the ESA, the final two

prongs of the injunction standard require the court to balance the equities of the competing

parties to determine whether the threatened injury outweighs the harm to the non-moving parties

and whether the injunction would serve the public interest.  *See Alabama v. U.S. Army Corps of*

*Engineers*, 424 F.3d 1117, 1128 (11th Cir. 2005).  The court is relieved that the results previously

reached do not necessitate that the court make such difficult balancing decisions in this case.

However, as previously noted, the court acknowledges that the purpose and policy embodied in

the ESA weigh heavily in favor of protecting endangered species and must be given deference.

The court is also cognizant of the water needs of the upstream users, including municipalities,

industries, agriculture, and power plants.  The severe drought affecting the southeast requires that

conservation efforts be undertaken to protect the precious and limited water resources so that

water will be available to meet the various needs for it, including the long term protection of the

ACF species.  The effects of the drought should not fall disproportionately upon the mussels, an

23

endangered species that Congress has declared deserves protection "whatever the costs." *See TVA v. Hill*, 437 U.S. 153, 184 (1978).

The court cannot say based on the evidence before it that the injunction sought by Florida – mandatory minimum flows of 6,300 cfs until FWS issues its biological opinion on September 5, 2006 – will not do more harm than good to the mussels and the ACF ecosystem. *Cf. American Rivers v. U.S. Army Corps of Engineers*, 271 F. Supp. 2d 230, 261-62 (D. D.C. 2003) (finding that the requested relief would not only benefit the protected wildlife, but also the public interest in preserving the ecosystem.)  The reduction of water stored in the upstream reservoirs as estimated by the experts may well affect the ability to protect these mussel species and the endangered sturgeon over the long term.  As recognized by FWS, instantaneous measures to alleviate some of the potential harm to all the protected species may not be sustainable.  Thus, the court cannot find in this case that the public interest in preserving the endangered species would be served by granting the injunction.

## VI.  CONCLUSION

In summary, the court finds that Florida's proof falls short of establishing that the actions by the Corps in implementing the IOP have caused or will cause a take of the protected mussels in the Apalachicola River basin.  The Corps cannot control the weather, nor can it be held responsible for the effects of the weather on the mussels' habitat.  The Corps, in consultation with FWS, faces the unenviable task of balancing the competing demands for the dwindling amounts of water in the reservoirs it manages.  Providing more water for the mussels than nature has herself demonstrates that the Corps takes seriously its responsibility to ensure that its actions do not jeopardize the continued existence of these mussels.

The court commends the good faith efforts made by the parties to resolve their conflicting

claims to the limited water resource.  Particularly, the Interim Settlement Agreement reflects a historic milestone in this dispute that has spanned more than sixteen years.  The court sincerely hopes that this attitude of cooperation and compromise will carry forward and result in an overall resolution of this dispute.  The parties – with the assistance of their experts and FWS – are in the best positions to fashion a resolution that properly considers the competing demands for this precious water while addressing the mandates of the ESA to protect the ACF species.

Having found that Florida failed to show that the Corps' actions caused an unlawful "take" of federally protected species, the court finds that Florida's Renewed Motion for Temporary Restraining Order is due to be **DENIED**.  The court will enter a separate Order to this effect.

DONE and ORDERED this 25th day of July, 2006.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE